**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

<table>
<tr><td>IN RE: INTEL CORP. CPU MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION<br><br>_____<br><br>This Document Relates to All Actions.</td><td>Case No. 3:18-md-2828-SI<br><br>**OPINION AND ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND**</td></tr>
</table>

Christopher A. Seeger, SEEGER WEISS LLP, 55 Challenger Road, Ridgefield Park, NJ 07660; Rosemary Rivas, LEVI & KORSINSKY LLP, 44 Montgomery Street, Suite 650, San Francisco, CA 94104; Steve D. Larson and Jennifer S. Wagner, STOLL STOLL BERNE LOKTING & SHLACHTER PC, 209 SW Oak Street, Suite 500, Portland, OR 97204; Gayle M. Blatt, CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD LLP, 110 Laurel Street, San Diego, CA 92101; Stuart A. Davidson, ROBBINS GELLER RUDMAN & DOWD LLP, 120 East Palmetto Park Road, Suite 500 Boca Raton, FL 33432; Melissa R. Emert, STULL, STULL & BRODY, 6 East 45th Street, New York City, NY 10017; Richard M. Hagstrom, HELLMUTH & JOHNSON PLLC, 8050 West 78th Street, Edina, MN 55439; Jennifer L. Joost, KESSLER TOPAZ MELTZER & CHECK LLP, One Sansome Street, Suite 1850, San Francisco, CA 94104; Adam J. Levitt, DICELLO LEVITT & CASEY LLC, Ten North Dearborn Street, 11th Floor, Chicago, IL 60602; and Charles E. Schaffer, LEVIN SEDRAN & BERMAN LLP, 510 Walnut Street, Suite 500, Philadelphia, PA 19106. Of Attorneys for Plaintiffs.

Daniel F. Katz, David S. Kurtzer-Ellenbogen, and Rachel Rodman, WILLIAMS & CONNOLLY LLP, 725 Twelfth Street NW, Washington, D.C. 20005; and Steven T. Lovett and Rachel C. Lee, STOEL RIVES LLP, 760 SW Ninth Avenue, Suite 3000, Portland, OR 97205. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

In this multidistrict proceeding, Plaintiffs bring a putative nationwide class action against Defendant Intel Corporation ("Intel") relating to certain security vulnerabilities in Intel's microprocessors. Those vulnerabilities have become generally known as "Spectre," "Meltdown," and "Foreshadow." Intel has moved to dismiss this lawsuit. Intel first argues that Plaintiffs lack standing. Intel also argues that Plaintiffs fail to state any nationwide class claim or any state subclass claim. For the reasons stated below, the Court grants Intel's motion to dismiss, finding that Plaintiffs lack standing. The Court also gives Plaintiffs leave to amend. Because Plaintiffs may choose to file an amended pleading, the Court, in the interest of efficiency for all parties, also resolves many of the substantive arguments raised by Intel relating to the sufficiency of Plaintiffs' allegations.

In their Consolidated Class Action Allegation Complaint ("Consolidated Complaint") (ECF 115), Plaintiffs allege that Intel knew about certain defects in its computer processors but failed to disclose them. Plaintiffs contend that Intel's processors have two primary design defects. First, the design of the processors heightens the risk of unauthorized access to protected memory secrets. Second, the design does not completely delete, or undo, the memory's recent retrieval of those secrets, also increasing the risk of unauthorized access. Plaintiffs further assert that Intel knew about the first design flaw since at least 2006, when Intel moved to multi-core processors, and that Intel knew about the second design flaw since at least 1995. Plaintiffs state that these design defects create security vulnerabilities that could lead to a breach of confidential data. Plaintiffs also allege that the "patches" created or distributed by Intel to fix these defects substantially diminish the speed of Intel's processors.

Based on these alleged defects and Intel's allegedly inadequate and untimely disclosures and responses, Plaintiffs assert the following nationwide class claims: (1) breach of implied warranty; (2) fraud by concealment or omission; (3) constructive fraud; (4) breach of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; (5) breach of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (6) breach of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; and (7) unjust enrichment, or quasi-contract. Plaintiffs also assert separate state subclass claims for each state except California and Massachusetts, plus the District of Columbia and the U.S. Virgin Islands, under each jurisdiction's deceptive or unfair trade practices act or consumer protection law. Plaintiffs seek both money damages and injunctive relief. As noted above, Intel has moved to dismiss this lawsuit.

## STANDARDS

### A. Standing

The United States Constitution confers limited authority on federal courts to hear only active cases or controversies brought by persons who establish standing. *See Spokeo*, 136 S. Ct. 1540, 1546-47 (2016); *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 89-90 (2013). Standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo*, 136 S. Ct. at 1547.

To have constitutional standing under Article III, a plaintiff must have "personal interest . . . at the commencement of the litigation." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The required personal interest must satisfy three elements: (1) an injury in fact, *i.e.*, an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent; (2) a causal connection between the injury-in-fact and the defendant's challenged behavior; and (3) a likelihood that the injury-in-fact will be

redressed by a favorable ruling. *Id.* at 180-81, 189; *see also Spokeo*, 136 S. Ct. at 1547

(reiterating that the "irreducible constitutional minimum" of standing consists of "an injury in

fact . . . fairly traceable to the challenged conduct of the defendant, and . . . likely to be redressed

by a favorable judicial decision").

An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual

way." *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1

(1992)). An injury is "concrete" if it is "'*de facto*'; that is, it must actually exist," meaning that it

is "'real' and not 'abstract.'" *Id.* "'Concrete' is not, however, necessarily synonymous with

'tangible.' Although tangible injuries are perhaps easier to recognize, [the Supreme Court has]

confirmed in many . . . previous cases that intangible injuries can nevertheless be concrete." *Id.*

at 1549.

A plaintiff also "must show standing with respect to each form of relief sought."

*Ellis*, 657 F.3d at 978. To establish Article III standing to seek prospective injunctive relief, a

plaintiff must "allege either 'continuing, present adverse effects'" of a defendant's past illegal

conduct, "or 'a sufficient likelihood that [he] will again be wronged in a similar way." *Villa v.*

*Maricopa Cty.*, 865 F.3d 1224, 1229 (9th Cir. 2017) (quoting *O'Shea v. Littleton*, 414 U.S. 488,

495-96 (1974), and *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983)). Further, standing to seek

equitable relief requires "a showing of an inadequate remedy at law and . . . a serious risk of

irreparable harm." *Pulliam v. Allen*, 466 U.S. 522, 537 (1984); *see also O'Shea*, 414 U.S. at 499.

In the context of a class action, "standing is satisfied if at least one named plaintiff meets

the requirements." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007). A

plaintiff carries this burden by showing "the manner and degree of evidence required" by

whatever stage of litigation the case has reached. *Lujan*, 504 U.S. at 561.[1] "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* at 561 (alteration in original) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)); *see also Barnum Timber Co.*, 633 F.3d at 899 (noting that at the motion to dismiss stage, a plaintiff establishes Article III standing through allegations of "specific facts plausibly explaining" why the standing requirements are met).

## B. Failure to State a Claim

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all

---

[1] "[T]he evidence necessary to support standing may increase as the litigation progresses . . . ." *Barnum Timber Co. v. EPA*, 633 F.3d 894, 899 (9th Cir. 2011) (citing *Lujan*, 504 U.S. at 561); *see also Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1012 n.3 (1992) ("*Lujan*, since it involved the establishment of injury in fact at the *summary judgment stage*, required specific facts to be adduced by sworn testimony; had the same challenge to a generalized allegation of injury in fact been made at the pleading stage, it would have been unsuccessful." (emphasis in original)).

reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epstein Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

## BACKGROUND

Intel manufactures microprocessors (also called "processors" or "chips"). A microprocessor is an integrated electronic circuit that contains the functions of a central processing unit ("CPU") of a computer. The CPU is the "brains" of the computing device, performing the necessary computations for programs, such as Microsoft Word, and peripheral devices, such as printers. Each program communicates with the processor through instructions, with each instruction representing a calculation or operation that the CPU must execute on behalf of the requesting program. For each calculation, the CPU "fetches" the instruction from the computer's memory, "decodes" it, "executes" it, and, finally, "writes-back" the result. The time it takes a CPU to process instructions is measured in "clock cycles." Each step in the process— fetch, decode, execute, and write-back—takes at least one clock cycle. The number of clock

PAGE 6 – OPINION AND ORDER

cycles that a CPU completes per second is known as the "clock rate." The speed of a CPU may be measured in "clock speed."

CPU speed may be an element of a consumer's decision to purchase a microprocessor or a computer that contains a specific microprocessor. Intel markets its microprocessors as having faster clock speed than the processors of its competitors and charges a premium for its fastest processors. To obtain higher clock speed, and without going into too much technical detail, modern processors usually implement two techniques—branch prediction and speculative execution. These techniques allow the CPU to predict what actions might be needed, perform those actions "out of order," and later reconcile what actions actually are needed versus what actions should be discarded. The CPU then properly orders the actions that were needed.

Plaintiffs allege that Intel made a design choice to focus on clock speed to the detriment of security. Plaintiffs contend that Intel's design implements branch prediction, speculative execution, out-of-order execution, and an unsecured cache subsystem in a way that contains two primary flaws. The first alleged flaw ("Flaw One") creates windows of time during which an unauthorized user could have the processor make unnecessary or unauthorized memory access to copies of sensitive or privileged data. This essentially allows the return of "secrets" to a "transient instruction." The second alleged flaw ("Flaw Two") allows the accessed privileged information (or data about that privileged information sufficient to allow an unauthorized user to retrieve the privileged information) to remain in the CPU's cache after the mistaken or unauthorized access is discovered during the "reconciliation" step.[2] Flaw Two essentially is an "incomplete undo."

---

[2] The Consolidated Complaint discusses these two alleged flaws in a technical manner. In Plaintiffs' briefing and at oral argument they discussed the two alleged flaws as "Flaw One" and

Plaintiffs allege that these flaws, resulting from Intel's choice to prioritize processing speed rather than security, makes users' confidential information more susceptible to "side-channel attacks." Side-channel attacks are based on information gleaned from operating the computer system and are not reliant on software bugs. Plaintiffs allege that Flaw One has existed since 2006, and Flaw Two has been in place since 1995. Plaintiffs also allege that Intel knew that its processors were vulnerable to side-channel attacks resulting from these two design flaws. Plaintiffs further allege that the fact that Intel's processors were susceptible to side-channel attacks was generally known in the computer industry and began appearing in relevant literature in the mid-1990s.

Starting in 2017, independent research teams began discovering specific processor vulnerabilities. In 2017, two were discovered, named "Spectre" and "Meltdown." In January 2018, a third was discovered, named "Foreshadow." Plaintiffs allege that these three security vulnerabilities exploit the two flaws in Intel's chip design.[3] In January 2018, it was publicly revealed that Intel's microprocessors were vulnerable to these security risks. Plaintiffs allege that the microprocessors of AMD and other competitors of Intel are not vulnerable to the Meltdown and Foreshadow security risks because those risks result from Intel's specific microprocessor design choices. These vulnerabilities allegedly arise from Flaw One. Spectre, on the other hand, is a widespread vulnerability that allegedly arises from Flaw Two and is shared by other microprocessor designs. Plaintiffs do not allege that they, or anyone else, has had their computer breached or that any data has been compromised as a result of any of the alleged defects in

"Flaw Two" to more succinctly reference them without a detailed, technical discussion each time. The Court also will reference these alleged flaws in this shorthand manner.

[3] Additional security vulnerabilities have since been discovered, after Plaintiffs filed their Consolidated Complaint. They are not included in Plaintiffs' allegations.

Intel's CPUs, through Spectre, Meltdown, Foreshadow, or any similar exploitation of the alleged defects.

Plaintiffs also allege that Intel's mitigation efforts, including "patches," leave consumers more susceptible to future security breaches, have caused data loss and data corruption, and have significantly reduced the speed or other performance features of Intel's CPUs. Plaintiffs contend that Intel's conduct caused damage in the form of diminished value of Plaintiffs' computing devices and the loss to Plaintiffs of the benefit of their bargain. Plaintiffs also assert that they would not have purchased Intel's CPUs or would not have paid the same price that they paid if Plaintiffs had known about these security flaws in the Intel microprocessors. Plaintiffs also request punitive damages and declaratory and injunctive relief.

**DISCUSSION**

## A. Standing

### 1. Monetary Relief

In its motion to dismiss, Intel argues that none of the Named Plaintiffs allege a concrete and particularized injury adequate to show Article III standing. In response, Plaintiffs state: (1) they expected their Intel CPUs to provide the performance and security advertised by Intel; (2) they expected their Intel CPUs safely to secure stored data from unauthorized access; (3) Intel's processors are defective and render Plaintiffs' confidential data vulnerable to a security breach; and (4) but for Intel's misrepresentations and omissions, Plaintiffs would not have purchased computers with Intel CPUs or would have paid less. Plaintiffs also allege that Intel's conduct caused Plaintiffs to suffer damage, including the diminution in value of their CPUs and the failure to receive the full benefit of their bargain. Plaintiffs argue that these allegations are sufficiently concrete and particularized to support standing. The Court addresses each type of alleged injury separately.

PAGE 9 – OPINION AND ORDER

### a. Diminution in value

Intel argues that Plaintiffs' allegations do not show the concrete and particularized injury of diminution in value because Plaintiffs offer nothing other than a conclusory allegation that the value of their CPUs has diminished. Intel maintains that absent more detailed factual allegations supporting the alleged decline in value, such as facts relating to the market for Intel CPUs, Plaintiffs' allegations of diminution in value and resultant overpayment are insufficient. In support, Intel cites *In re Apple Processor*, 366 F. Supp. 3d 1103 (N.D. Cal. 2019), and *Cahen v. Toyota Motor Corp.*, 717 F. App'x 720 (9th Cir. 2017).

In *Cahen*, the plaintiffs alleged that a defect made their vehicles vulnerable to hacking. *Cahen*, 717 F. App'x at 723. The plaintiffs alleged "that they suffered an injury because they either would not have purchased their vehicles or would have paid less for them had they known about these hacking risks." *Id.* In an unpublished opinion, the Ninth Circuit affirmed the district court's finding that these allegations did not support standing. *Id.* The Ninth Circuit explained:

> This economic loss theory is not credible, as the allegations that the vehicles are worth less are conclusory and unsupported by any facts. The district court was correct in noting that "plaintiffs have not, for example, alleged a demonstrable effect on the market for their specific vehicles based on documented recalls or declining Kelley Bluebook values . . . [n]or have they alleged a risk so immediate that they were forced to replace or discontinue using their vehicles, thus incurring out-of-pocket damages." Additionally, "[n]early 100% of cars on the market include wireless technologies that could pose vulnerabilities to hacking or privacy intrusions." Thus, plaintiffs have only made conclusory allegations that their cars are worth less and have not alleged sufficient facts to establish Article III standing.

*Id.* at 723-24 (alterations in original).

The plaintiffs in *In re Apple Processor* raised similar allegations as Plaintiffs, asserting that defects in Apple's manufacturing caused its products to be vulnerable to Meltdown and Spectre. 366 F. Supp. 3d at 1105. U.S. District Judge Edward J. Davila of the Northern District

of California, relying on *Cahen*, rejected the plaintiffs' argument that alleging diminution in value and resulting overpayment was sufficient. *Id.* at 1109. Judge Davila stated:

> Like the plaintiffs in *Cahen*, Plaintiffs here do not allege facts to show their iDevices are worth less than what they paid for them. Plaintiffs do not allege any facts about the market for their iDevices. Plaintiffs do not allege that Meltdown and Spectre posed such an immediate risk that they were forced to replace or discontinue use of their iDevices. Nor do Plaintiffs allege that they were forced to replace or discontinue use of their iDevices due to the alleged degradation in performance. Instead, Plaintiffs assert conclusory allegations that they "would not have purchased [their] iDevices, or paid the prices they did." CAC ¶ 46. Therefore, the court rejects Plaintiffs' diminution in value argument.

*Id.* at 1110.

In contrast, allegations of overpayment based on an alleged specific degradation in performance have been found sufficient to support Article III standing. *See, e.g., Hauck v. Advanced Micro Devices, Inc.*, 2019 WL 1493356, at \*9 (N.D. Cal. April 4, 2019) ("*Hauck II*"). In *Hauck II*, U.S. District Judge Lucy H. Koh noted, "While some courts have rejected conclusory overpayment allegations, Plaintiffs here have alleged that their processors experienced performance slowdowns after Plaintiffs installed patches developed to address Spectre." *Id.* In finding that standing was adequately alleged, Judge Koh reiterated that "*all* Plaintiffs in the instant case have alleged that they personally experienced decreased performance of their processors after installing patches that third parties—not AMD—released to mitigate the Spectre vulnerability." *Id.* (emphasis added). She contrasted the plaintiffs' allegations in *Hauck II* with those in *In re Apple Processor*, noting that the plaintiffs in *In re Apple Processor* had not alleged specific decreased performance in their devices. *Id.*

Plaintiffs here, like the plaintiffs in *Cahen* and *In re Apple Processor*, allege no facts about the market for computers with Intel processors. They allege at least one defect (Flaw Two) in Intel's and its competitors' microprocessors. That defect was widespread in the industry.

PAGE 11 – OPINION AND ORDER

Plaintiffs do not explain how this alleged defect would have affected the market price for Intel's chips in light of the fact that it involved all the chips in the market.

Only one Named Plaintiff alleges any facts specific to that Plaintiff about the alleged degradation in performance. Only Named Plaintiff DK Systems, LLC ("DK Systems") makes any allegation of decreased performance.[4] DK Systems, however, simply alleges that it has "experienced performance degradation . . . including reduced speed." Named Plaintiffs Gloria Park and Christopher Gulley allege that they bought new computers as a result of problems with their existing computers, but they do not allege that the security patches caused those problems.

In addition, none of the Named Plaintiffs allege that they have discontinued using or replaced their computers because of the alleged defects. Indeed, five Named Plaintiffs bought their computers *after* the security vulnerabilities were announced, and two Named Plaintiffs even bought new computers with Intel processors after filing their lawsuits against Intel alleging that they would not have bought computers with Intel processors or would not have paid full price had they known about the alleged defects. The Court finds that Plaintiffs have not plausibly alleged diminution in value and resulting overpayment damages.[5]

---

[4] Plaintiffs argue that their general allegation that the patches caused a degradation in performance is enough to confer standing. The performance testing, however, shows that some devices experienced significant reduction in performance while other devices experienced little to no reduction in performance. This does not confer standing on all persons owning Intel microprocessors, absent specific allegations of degraded performance in the individual's personal device. *See, e.g.*, *In re Apple*, 366 F. Supp. 3d at 1110.

[5] The cases cited by Plaintiffs in support of their theory of overpayment involve either defects that affect the overall market value of the product or allegations from which such a reduction in market value may reasonably be inferred, such as product recalls.

### b. Benefit of the bargain

Plaintiffs also allege that they were harmed by not receiving the full benefit of their bargain. Plaintiffs contend that they have plausibly alleged that they did not receive the data security that they expected and for which they paid. Intel argues that Plaintiffs fail to allege that Intel CPUs being "free of any and all security vulnerabilities" was part of the parties' bargain. Plaintiffs, however, do not allege that Intel has caused damage because its CPUs were not free of "any and all security vulnerabilities." Instead, Plaintiffs allege only that they expected Intel to take "adequate measures to secure stored data." The relevant questions, therefore, are whether taking "adequate measures to secure stored data" was part of the parties' underlying bargain and, if so, what "adequate measures" means in the context of the parties' bargain.

Whether data security was part of the parties' underlying bargain has been discussed most often in the context of lawsuits involving actual data breaches. Intel argues that the Court should not consider data breach cases because this lawsuit does not involve any data breach that has occurred. Concerning this issue of whether data security was part of the parties' bargain, however, there is some similarity between data breach cases and the present lawsuit.

Intel also contends that the Court will find better guidance in product defect cases that do not involve injury, like *Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir. 2009); *Azoulai v. BMW of N. Am. LLC*, 2017 WL 1354781 (N.D. Cal Apr. 13, 2017); and *Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267 (C.D. Cal. 2016). Intel argues that "no injury defect" cases are closer to Plaintiffs' claims than are data breach cases. Contrary to Intel's position, the Court finds that data breach cases do shed some light on whether part of the bargain here includes relevant data security. Moreover, even if the Court were to consider the cases cited by Intel, those cases are not very instructive because they are factually distinguishable.

*Birdsong*, *Azoulai*, and *Lassen* all involved products that worked as advertised and were found not to be defective because the plaintiffs in those cases merely claimed that the products could have included additional features to make them safer. The courts found that those other features simply were not part of the parties' original bargain. *See Birdsong*, 590 F.3d at 959, 961-62; *Azoulai*, 2017 WL 1354781, at *6; *Lassen*, 211 F. Supp. 3d at 1283-84. Plaintiffs here, however, are not alleging that Intel should have included additional features to make an otherwise-working processor better or safer. Instead, Plaintiffs allege that the processors simply are not safe as designed and that after third parties discovered and disclosed this information, Intel issued many patches. Intel's decision to issue patches, which Plaintiffs allege cause up to a 30 percent decrease in performance, supports the allegation that the processors could not be left as originally manufactured by Intel. The Court thus finds the data breach cases more instructive because they explicitly consider whether data security was part of the parties' underlying bargain. The lesson learned from those cases is that data security in goods or services that involve a user's most sensitive and confidential information is not simply another feature but something that the average consumer would generally presume is included in the processor or computer.

In data breach cases, however, courts are divided on the level of detailed factual allegation required to show that data security was part of the bargain. Some courts accept more general allegations that data security was expected and was part of the bargain. *See, e.g.*, *Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 716 (8th Cir. 2017) ("Kuhns alleged that he bargained for and expected protection of his PII, that Scottrade breached the contract when it failed to provide promised reasonable safeguards, and that Kuhns suffered actual injury, the diminished value of his bargain. Whatever the merits of Kuhns's contract claim, and his related claims for breach of

implied contract and unjust enrichment, he has Article III standing to assert them."); *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 985 (N.D. Cal. 2016) (finding that the plaintiffs alleged benefit-of-the-bargain losses when they alleged that they did not receive the full value of services for which they paid because of the defendant's failure to implement promised security measures); *In re Facebook Privacy Litig.*, 192 F. Supp. 3d 1053, 1059 (N.D. Cal. 2016) (accepting benefit-of-the bargain damages based on allegations that the plaintiffs gave up something of value in exchange for access to Facebook and Facebook's promises relating to privacy, that Facebook breached the contract by violating its privacy terms, and that Facebook thus deprived the plaintiffs of their benefit of the bargain); *Svenson v. Google Inc.*, 2015 WL 1503429, at *4 (N.D. Cal. Apr. 1, 2015) (accepting benefit-of-the-bargain damages based on allegations that the plaintiff and putative class members paid Google for services that included protecting confidential information, that the services received "were worth quantifiably less than the services [the plaintiffs] agreed to accept," and that the plaintiffs would not have purchased the services had they known that the services they received included insufficient data protection); *In re LinkedIn User Privacy Litig.*, 2014 WL 1323713, at *6 (N.D. Cal. Mar. 28, 2014) (accepting overpayment damages based on allegations that the plaintiff bought services from the defendant because it represented the services as secure, that the defendant's services were not in fact secure, and that the plaintiff thus overpaid for the defendant's services as a result of the defendant's misrepresentations); *Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 687 (E.D. Mich. 2013) (finding that the plaintiffs sufficiently alleged "that they didn't receive the full benefit of their bargain" by alleging that they suffered monetary harm because "a portion of the price of each Redbox rental paid for by Plaintiffs . . . was intended to ensure the

confidentiality of Plaintiffs' . . . Personal Viewing Information" (alterations in original) (citation omitted)).

Other courts, however, require more specific factual allegations showing how data security was a part of the bargain or how much of the money spent was for data security. *See, e.g.*, *Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1 (D.D.C. 2019) (holding that "trend or no across the country" towards allowing this type of damages in data breach cases, the court would follow earlier opinions in the district refusing to accept benefit-of-the-bargain damages "in the absence of controlling law from the District of Columbia Court of Appeals" and emphasizing the broad allegations involved in the case as distinguishable from more specific allegations of harm in some cases accepting the theory); *Fero v. Excellus Health Plain, Inc.*, 236 F. Supp. 3d 735, 755 (W.D.N.Y. 2017), *on reconsideration sub nom. Fero v. Excellus Health Plan, Inc.*, 304 F. Supp. 3d 333 (W.D.N.Y. 2018) (*rev'd in part on other grounds*) (finding that because the complaint "lacks any factual allegations that would support the claim that Plaintiffs paid a specific amount of money for data security. . . . Plaintiffs' alleged overpayment is not a basis for standing"); *Khan v. Children's Nat'l Health Sys.*, 188 F. Supp. 3d 524, 531, 533 (D. Md. 2016) (finding no standing based on overpayment allegations when plaintiff did "not allege any facts showing that she overpaid for . . . services or that she would have sought those services from another provider had she been aware of the hospital's allegedly lax data security"); *In re Zappos.com, Inc.*, 108 F. Supp. 3d 949, 962 n.5 (D. Nev. 2015) (finding no standing based on "diminished value of the services provided by Zappos" because the plaintiffs failed to "allege facts showing how the price they paid for [Zappos's] goods incorporated some particular sum that was understood by both parties to be allocated towards the protection of customer data"); *In re Science Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 30 (D.D.C. 2014) ("To the

extent that Plaintiffs claim that some indeterminate part of their premiums went toward paying for security measures, such a claim is too flimsy to support standing.").

The Court does not find persuasive the cases requiring allegations of a particular sum of the purchase price being explicitly allocated for data security. That is requiring too much. The Court finds more persuasive the line of cases that accept at the pleading stage more general factual allegations about the plaintiff's expectations for data security and the contours of the parties' bargain. Plaintiffs, however, must still allege sufficient underlying facts to show standing.

In data breach cases there already has been a breach of security, and the plaintiffs in those cases contend that a minimum level of reasonable security protection was part of the parties' bargain and expectation. Here, in contrast, there has been no data breach. Further, Plaintiffs' allegations show that for decades it was known in the industry that Intel's designs were vulnerable to various side-channel attacks. Yet no actual security breach occurred over the years, despite these known security vulnerabilities. Even after these and other security vulnerabilities became more publicly known, they were still only theoretical and have been exposed in conceptual form. There are no allegations of any actual data breaches or "hacks" to date as a result of the alleged security vulnerabilities.

Plaintiffs also allege that Intel's success largely is based on the speed of its processors. Plaintiffs, however, do not allege that they would have sacrificed that processing speed for additional security against theoretical vulnerabilities, most of which had been known in the industry for two decades. Plaintiffs instead assert only general, conclusory allegations about desiring and expecting "adequate" security. The Court finds that Plaintiffs have not sufficiently alleged their reasonable expectations for data security or the absence of the specific alleged

PAGE 17 – OPINION AND ORDER

security vulnerabilities. Plaintiffs also have not sufficiently alleged what "adequate measures" they reasonably expected relating to the alleged security vulnerabilities or what they allege was the parties' bargain that Intel did not meet.

### 2.  Declaratory and Injunctive Relief

Plaintiffs also seek declaratory and injunctive relief. Plaintiffs allege that injunctive relief is "particularly necessary" because Plaintiffs desire to purchase Intel CPUs if they perform as represented by Intel and Plaintiffs will be unable to determine if Intel's representations in the future about its products will be truthful. Plaintiffs further allege that they "expect" that Intel will conceal or mispresent defects in future products.

Intel argues that Plaintiffs lack standing to request declaratory or injunctive relief because this allegation is speculative and not based on any underlying factual allegation. Plaintiffs respond that Intel's history of "touting" its CPU's security, misrepresenting CPU performance, withholding information about security vulnerabilities, and unwillingness to address known security defects makes the threat of future misrepresentations or omissions by Intel sufficiently real and immediate to support standing for injunctive relief.

The Court finds that Plaintiffs' allegations about their requested injunctive relief are too vague and imprecise to support standing. It is unclear what future anticipated threatened malfeasance by Intel Plaintiffs are alleging. Plaintiffs may be alleging that future Intel products will have new defects—which would be unduly speculative—that Intel will cover up. On the other hand, Plaintiffs may be alleging that future products will suffer from the same defects as current products, but Intel will engage in new misrepresentations and omissions about these defects.

It is also unclear what specific injunctive remedy Plaintiffs anticipate requesting from the Court. Standing requires that an injury-in-fact will be redressed by a favorable ruling. *See*

PAGE 18 – OPINION AND ORDER

*Spokeo*, 136 S. Ct. at 1547. In their response to Intel's motion to dismiss, Plaintiffs cite to

*Davidson v. Kimberly-Clark Corporation*, 889 F.3d 956 (9th Cir. 2018). In *Kimberly*, the Ninth

Circuit held that a deceived consumer may have standing to enjoin false advertising and false

labeling of a product, even though the consumer now knows that the product is not as advertised.

*Id.* at 969-70. The court found sufficient future harm in the consumer's inability to rely on future

advertisements or inability to view the advertisements and assume that the product had

improved. *Id.* Plaintiffs, however, do not allege false advertising or false labelling for purposes

of standing, particularly given that they do not allege that they bought products directly from

Intel or as a result of advertising or labels produced by Intel. All that Plaintiffs allege is a

boilerplate statement that they expected their products to perform as advertised and represented

by Intel, but no Plaintiff alleges any specific advertisement or label that they viewed or on which

they relied.

### 3. Entity Standing

Intel also argues that entity Named Plaintiffs The City of New Castle and Zog, Inc. (both

of Pennsylvania) and Alliance Healthcare System, Inc. (of Mississippi) all lack standing for their

state subclass claims because the state statutes apply only to "persons" who bought the goods at

issue "primarily for personal, family or household purposes." Plaintiffs respond that both

Pennsylvania and Mississippi define "person" broadly to include "corporations, trusts,

partnerships, incorporated or unincorporated associations, and any other legal entities" and thus

these Named Plaintiffs are "persons" under the relevant statutes. Plaintiffs argue that these

entities were acting for their own "personal" use, as that term is commonly construed, because

the entities used the Intel CPUs to conduct their "personal" affairs. Plaintiffs cite *FTC v. Mylan*

*Laboratories, Inc.*, 62 F. Supp. 2d 25, 48 (D.D.C. 1999), as holding that State Medicaid

programs, wholesalers, retail pharmacy chains, and other customers were "consumers" with

PAGE 19 – OPINION AND ORDER

standing to sue under the Michigan Consumer Protection Act, which similarly requires purchases "primarily for personal, family, or household purposes."

Intel argues that these entity Named Plaintiffs used their Intel CPUs for business purposes and thus lack standing under state statutes that require use for personal, family, or household purposes. Intel notes that Plaintiffs cite no case from Pennsylvania or Mississippi that allows a plaintiff using the product for business purposes to proceed with a claim. Intel also cites *Overseers, LLC v. Adkins*, which held that Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") did not apply to a claim arising out of a property used for a "combination of residential, investment, and commercial" purposes. 2018 WL 1918464, at *5 (Pa. Super. Ct. Apr. 24, 2018).

In *Mylan Laboratories*, relied on by Plaintiffs, the court noted that it was unclear in the statute whether the phrase "primarily for personal, family or household purposes . . . . modifies the way in which the drugs were provided or the drugs themselves." 62 F. Supp. at 48. The court held that "[d]rugs sold to state Medicaid programs or drug stores are not outside the scope of personal, family or household purchases." *Id.* The dispositive factor for the court in *Mylan Laboratories* was that the drugs themselves would ultimately be used for a personal use, even if the drug store or state Medicaid program first had to sell them to the individual who would then use them for personal use. Even if the Court accepted this as the correct analysis, that is not the situation with the CPUs involved here. The entity Named Plaintiffs were not reselling the CPUs to individuals who would use them for personal or household use. Instead, the entity Named Plaintiffs used the CPUs as the final "consumer," except their "personal" use was for government or business purposes. The relevant question, therefore, is whether under the relevant

PAGE 20 – OPINION AND ORDER

statutes an entity that is the end user consumer but who uses the product in the daily affairs of its business uses the product for "personal" use.

The Court of Common Pleas of Pennsylvania discussed the purpose of Pennsylvania's UTPCPL:

> The Consumer Protection Law—unlike tort and contract law—creates rules for consumer transactions that differ from the rules for commercial transactions because of the consumer's lack of bargaining power, lack of knowledge, and lack of sophistication. It identifies business practices which—while not constituting common law fraud—place the consumer at an unfair disadvantage; it bars their use; and it creates a private action for a consumer who loses money or property as a result of the use of these practices.

*Ihnat v. Pover*, 2003 WL 22319459, at *2 (Pa. Com. Pl. Aug. 4, 2003). As another court similarly explained, the purpose of the UTPCPL is "to benefit the public at large by eradicating, among other things, 'unfair or deceptive' business practices." *Anadarko Petroleum Corp. v. Commonwealth*, 206 A.3d 51, 55 (Pa. Commw. Ct. Mar. 15, 2019) (quoting *Com., by Creamer v. Monumental Props., Inc.*, 459 Pa. 450, 457 (1974)). Because the UTPCPL "was in relevant part designed to thwart fraud in the statutory sense, it is to be construed liberally to effect its object of preventing unfair or deceptive practices." *Id.* (quoting *Monumental Props.*, 459 Pa. at 458).

The Superior Court of Pennsylvania considered a claim under the UTPCPL brought by a company that had taken out an insurance policy (and was thus the end-user consumer), cancelled the policy, and sought but was denied a full refund of the premium paid. *Trackers Raceway, Inc. v. Comstock Agency, Inc.*, 400 Pa. Super. 432, 435 (1990). The court held:

> [The plaintiff] did not purchase the policy "primarily for personal, family or household purposes." The insurance policy at issue was purchased for commercial purposes only. Appellant seeks damages arising from the interruption of its business operations due to the misrepresentations of defendants. Therefore, Trackers has failed to state a cause of action under the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

*Id.* at 440.

Similarly, the City of New Castle and Zog, Inc., although end users of Intel's CPUs, bought them for use in the daily operations of the City and Zog's business, respectively.[6] This use is not for "personal, family or household purposes" as used in Pennsylvania's UTPCPL. *See also Girton Mfg. Co. Inc. v. Pennsylvania Mfrs.' Ass'n Ins. Co.*, 11 Pa. D. & C.4th 13, 15 (Com. Pl. 1989) (finding that because the plaintiff bought the insurance policy for itself as a business, the plaintiff's motivation in buying the insurance was business related and the insurance was "not intended for personal, family or household use"); *Waldo v. N. Am. Van Lines, Inc.*, 669 F. Supp. 722, 725-26 (W.D. Pa. 1987) ("The obvious intent of this language is to restrict claims brought under the [UTPCPL] to those which are legitimately of a consumer nature. Here, plaintiff bought the tractor and the insurance coverage solely for use in his trucking business and, as such, they cannot qualify as consumer goods . . . . he did not buy them to consume personally or with his family, but instead, purchased them to operate a business partnership with [the defendant]." (gathering cases that limited the application of the UTPCPL)); *McDermott v. Goodman*, 1985 WL 15437, at *4 (Pa. Com. Pl. Jan. 3, 1985) ("The [UTPCPL] is not applicable to this private action since the Jetstream was purchased *for use in a business premises* and not for personal, family and household purposes." (emphasis added)). The entity Named Plaintiffs also do not have the same lack of sophistication, knowledge, and bargaining power as does a typical

---

[6] The Court rejects Plaintiffs' argument that the City of New Castle acted as the trustee of its employees, who were acting for personal use. There are no allegations showing that the employees of the City of New Castle used the City's Intel CPUs for the employee's personal use, as opposed to use in the course and scope of their employment for the City.

individual consumer, to which the UTPCPL is directed. *Ihnat*, 2003 WL 22319459, at \*2;

*Waldo*, 669 F. Supp. at 726.[7]

The parties cite no relevant law from the courts in Mississippi. The Court also found little

relevant case law. The Mississippi Supreme Court, in discussing the Fair Credit Reporting Act,

noted that if a corporation applies for a business loan and a bank checks the credit report of the

corporation, "[b]ecause the report is being used for a decision on the credit of a business, rather

than credit for personal, family, or household purposes, the report falls outside the scope of the

[Fair Credit Reporting Act]." *Wolgin v. Experian Info. Sols., Inc.*, 101 So. 3d 1160, 1165 n.4

(Miss. 2012). This case supports Intel's argument.

In addition, the Southern District of Mississippi, noting that governments fall within the

definition of "persons" under the statute and that "persons" have the right to recover damages

under the statute, held that a government could sue under Mississippi's Consumer Protection

Act. *Hood v. AU Optronics Corp.*, 876 F. Supp. 2d 758, 769 (S.D. Miss.), *rev'd and remanded*

*on other grounds*, 701 F.3d 796 (5th Cir. 2012), *rev'd and remanded on other grounds*, 571

U.S. 161 (2014). That case, however, involved the Attorney General bringing a *parens patriae*

action on behalf of all consumers in the State, and not a government (or corporation) suing for its

own damages. Further, the Northern District of Mississippi, evaluating Mississippi's Motor

Vehicle Enforcement Warranty Act, found that an individual who bought a truck for use in his

business did not purchase it for "personal, family or household purposes." *Bryan v. Mack Trucks,*

*Inc.*, 2010 WL 1568607, at \*7 (N.D. Miss. Apr. 19, 2010).

---

[7] These claims are distinguishable, however, from claims asserted by the Attorney General of the State of Pennsylvania or by local district attorneys bringing an action under the UTPCPL in the public interest. These entities and persons are specifically authorized by the UTPCPL to bring such claims. *See* 73 P.S. § 201-4; *Anadarko*, 206 A.3d at 55-56.

The Court is not persuaded by Plaintiffs' argument that because corporations and governments are included within the definition of "person," if they purchase a product for their own use it is necessarily "personal" use under state consumer protection statutes. Under this theory, except for inventory bought for resale, all purchases by a business would be for "personal" use. That conflicts with case law discussing the term "personal use" in the context of many state statutes that contain the same or similar text. Considering the cases discussed above and the text and purpose of Mississippi's statute, the Court finds that under the Mississippi Consumer Protection Act, purchases by businesses for use in their business are not for "personal, family or household purposes."

For these reasons, Named Plaintiffs The City of New Castle and Zog, Inc. may not bring a claim under Pennsylvania's UTPCPL. Similarly, Named Plaintiff Alliance Healthcare System, Inc. may not bring a claim under Mississippi's Consumer Protection Act.

## B.  Nationwide Claim—Breach of Implied Warranty

Although the Court finds that Plaintiffs have not sufficiently alleged facts to support standing, in the interests of efficiency, the Court also addresses Intel's challenges to the sufficiency of Plaintiffs' allegations as stated in the Consolidated Complaint. This is intended to provide the parties with guidance relating to the sufficiency of Plaintiffs' allegations as currently pleaded if an Amended Consolidated Complaint is filed.

Intel argues that Plaintiffs' breach of implied warranty claim fails for three reasons: (1) Plaintiffs fail to allege that Intel's microprocessors were not fit for their ordinary use; (2) Plaintiffs fail to allege any false labeling by Intel; and (3) Plaintiffs fail to allege privity, required under California law. Because the Court finds that Plaintiffs fail to allege that Intel's microprocessors were not fit for their ordinary use or any false labeling, the Court need not reach Intel's argument on privity.

PAGE 24 – OPINION AND ORDER

California law provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Cal. Com. Code § 2314(1); *see also* Cal. Civ. Code § 1792 (establishing that "every sale of consumer goods that are sold at retail in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable"). The implied warranty of merchantability "does not impose a general requirement that goods precisely fulfill the expectation of the buyer. Instead, it provides for a minimum level of quality." *Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291, 1296 (Cal. App. 1995). Goods in conformity with the implied warranty of merchantability: "(1) Pass without objection in the trade under the contract description[;] (2) Are fit for the ordinary purposes for which such goods are used[;] (3) Are adequately contained, packaged, and labeled[; and] (4) Conform to the promises or affirmations of fact made on the container or label." Cal. Civil Code § 1791.1(a); *see also* Cal. Com. Code § 2314(2) (same, adding requirements relating to quality).

Intel contends that for the implied warranty of merchantability to apply, the product must lack "even the most basic degree of fitness for ordinary use." *Birdsong v. Apple, Inc.*, 590 F.3d 955, 958 (9th Cir. 2009). Intel argues that because Plaintiffs do not allege that Intel CPUs are not fit for computing, Plaintiffs' claim for breach of the implied warranty fails. Plaintiffs respond that the most basic function of a computer is to "compute securely" and thus the alleged defect implicates the most basic function of Intel's CPUs. Plaintiffs argue that the fact that they continue to use their computers or that some Plaintiffs bought computers with Intel microprocessors after the security vulnerabilities became known does not bar the implied warranty claims because a product does not have to fail entirely.

PAGE 25 – OPINION AND ORDER

Judge Koh considered similar allegations against AMD relating to its alleged microprocessor design defects that allegedly caused security vulnerabilities. *Hauck v. Advanced Micro Devices, Inc.*, 2018 WL 5729234, at *8 (N.D. Cal. Oct. 29, 2018) ("*Hauck I*"). Judge Koh noted that "whether the Defect is Spectre, security vulnerabilities created by AMD's design, or '20 years' of 'serious security vulnerabilities,' the [complaint] contains no allegation that the basic functionality of the processors has been compromised by the Defect." *Id.* (citation omitted). Plaintiffs' Consolidated Complaint suffers from the same deficiency. Plaintiffs do not assert that the allegedly defective CPUs corrupt data, freeze the computer, or render the computers unable to process commands or run programs. Simply labeling "secure computing" as a "basic" function of microprocessors does not show that the CPUs are not performing their ordinary purpose.

Plaintiffs analogize the Intel CPUs to a car that can run but "smells, lurches, clanks, and emits smoke" so that it is not fit for its ordinary purpose. *Isip v. Mercedes-Benz USA, LLC*, 67 Cal. Rptr. 3d 695, 700 (Cal. App. 2007). There is no allegation, however, that Intel's CPUs' computing functionality with the alleged defects is the equivalent of a car that smells, lurches, clanks or emits smoke. Plaintiffs complain that Intel's CPUs are vulnerable to potential side-channel attacks, not that the alleged defects otherwise affect the computing itself. Plaintiffs also complain that the patches required as result of the security vulnerabilities affect the performance of some computers or servers, with some researchers claiming a loss of performance of up to 30 percent. That, however, does not support a claim for breach of the implied warranty of merchantability. *Hauck I*, 2018 WL 5729234, at *9 ("Plaintiffs' 'ballpark figure of five to 30 per cent slow down' after patching the computer does not rise to the level of a serious enough defect to render the processors unfit for their ordinary purpose. This is because patching the Defect does not implicate the AMD processors' operability as computer processors, much like how the Prius'

PAGE 26 – OPINION AND ORDER

reduced mileage in the *Troup* [*v. Toyota Motor Corp.*, 545 Fed. App'x 668 (9th Cir. 2013)] case did not render the Prius unfit for its ordinary purpose." (citation omitted)).

As for Plaintiffs' claim of misleading labelling, they argue that Intel should have added information to their labels; Plaintiffs do not allege that Intel's labels contained false or misleading information. Plaintiffs cite cases in which courts found specific representations on labels to be misleading, and then argue that because Plaintiffs allege that Intel failed to disclose or warn of the alleged defects on Intel's labels, the labels were misleading. For labelling, however, the implied warranty under California law is based on a requirement that a product "[c]onform to the *promises or affirmations of fact made* on the container or label." Cal. Com. Code § 2314(2)(f) (emphasis added). This claim requires an affirmative representation and cannot be based on an alleged omission. *Accord Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1096 (N.D. Cal. 2017) ("When an implied warranty of merchantability cause of action is based solely on whether the product in dispute '[c]onforms to the promises or affirmations of fact' on the packaging of the product, the implied warranty of merchantability claim rises and falls with express warranty claims brought for the same product.").

## C.  Nationwide Claims—Fraud and the Statutes that Rely on Fraud

Intel argues that Plaintiffs have not stated a claim for fraud, whether by misrepresentation, concealment, omission, or constructive fraud, and thus also have not stated a claim under the CLRA, FAL, or the "fraud" prong of the UCL. Intel contends that Plaintiffs have not alleged: (1) actionable misrepresentations, concealment, or omissions; (2) materiality; (3) a duty to disclose; or (4) reliance. Intel also argues that the economic loss rule precludes Plaintiffs' claims of common law fraud. Plaintiffs respond that they have sufficiently alleged claims based

on a theory of material omission. Plaintiffs also argue that they have sufficiently alleged constructive fraud and that the economic loss rule does not bar their claims.[8]

### 1. Omissions-Based Claims

#### a. Standards

Plaintiffs argue that they have sufficiently alleged material omissions to support claims under California's FAL, CLRA, and the fraud prong of the UCL. The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The FAL prohibits any "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17500. These statutes "rely on the same objective test, that is, whether 'members of the public are likely to be deceived.'" *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 532 (C.D. Cal. 2011) (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009)). Plaintiffs in these cases must "show not only that a defendant's conduct was deceptive but that the deception caused them harm," which requires a showing of reliance. *Massachusetts Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1292 (2002), *as modified on denial of reh'g* (May 29, 2002).

Plaintiffs also allege common law fraud by concealment or omission. Under California law, to be liable for fraudulent concealment, "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the

---

[8] Plaintiffs do not dispute Intel's motion against Plaintiffs' nationwide claims based on affirmative misrepresentations or half-truths.

intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Linear Tech. Corp v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 131 (2007). To state a claim for fraudulent omission, a plaintiff need not show purposeful suppression or concealment, however, a plaintiff must allege "the omission of a fact the defendant was obliged to disclose." *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 835 (2006). Additionally, a plaintiff "must sufficiently allege that a defendant was aware of a defect at the time of sale." *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1145 (9th Cir. 2012).

Under the California statutes and common law, an omission is actionable "if the omitted fact is (1) contrary to a [material] representation actually made by the defendant or (2) is a fact the defendant was obliged to disclose." *Gutierrez v. Carmax Auto Superstores Cal.*, 19 Cal. App. 5th 1234, 1258 (2018) (alteration in original) (quotation marks omitted) (quoting *Daugherty*, 144 Cal. App. 4th at 835). The omitted fact must also be material. *See id.* at 1256. Something is material "if a reasonable consumer would deem it important in determining how to act in the transaction at issue." *Id.* at 1258.

The parties dispute the standard the Court should apply in evaluating whether Intel had a duty to disclose. Intel argues that the Court should apply the "safety hazard" requirement the Ninth Circuit discussed in *Wilson*. 668 F.3d at 1142-43. Plaintiffs argue that the Court should apply the "central functional" standard the Ninth Circuit discussed in *Hodsdon v. Mars, Inc.*, 891 F.3d 857 (9th Cir. 2018).

In *Wilson*, the Ninth Circuit noted that "California courts have generally rejected a broad obligation to disclose" and held that there is no duty to disclose a defect absent an affirmative

PAGE 29 – OPINION AND ORDER

misrepresentation or a safety hazard. *Id.* at 1141-42; *see also Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1025 (9th Cir. 2017) ("To state a claim for failing to disclose a defect, a party must allege (1) the existence of a design defect; (2) the existence of an unreasonable safety hazard; (3) a causal connection between the alleged defect and the alleged safety hazard; and that the manufacturer knew of the defect at the time a sale was made." (quotation marks omitted)). The requirement in *Wilson* and *Williams* that a safety hazard be alleged has been cast into doubt by some California Court of Appeal opinions. *See Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164 (2015); *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249 (2011). These appellate decisions extend liability for non-disclosure by sanctioning an "omission claim when: the plaintiff alleges that the omission was material; second, the plaintiff must plead that the defect was central to the product's function; and third, the plaintiff must allege one of the four *LiMandri* factors." *Hodsdon*, 891 F.3d at 863 (citing *Collins*, 134 Cal. Rptr. 3d at 593-95). The *LiMandri* factors are as follows: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997) (quoting *Heliotis v. Schuman*, 181 Cal. App. 3d 646, 651 (1986)).

The Ninth Circuit in *Hodson* stated:

> The recent California cases show that *Wilson's* safety hazard pleading requirement is not necessary in *all* omission cases, but that the requirement may remain applicable in some circumstances. In other words, *Collins* and *Rutledge* are not necessarily irreconcilable with *Wilson* because, where the challenged omission does not concern a central functional defect, the plaintiff may still have to plead a safety hazard to establish that the defendant had a duty to disclose.

*Hodsdon*, 891 F.3d at 864 (emphasis in original).

Judge Davila noted:

> This Court has reviewed all the cases that counsel referred it to that cite *Hodsdon*, and conducted its own search. Most of these cases appear to conclude that either a safety hazard or a central function defect trigger a duty to disclose, and none of these cases specifically conclude that a safety hazard is required to trigger a duty to disclose.
>
> * * *
>
> Following *Hodsdon*, this Court concludes that when a defect does not relate to an unreasonable safety hazard, a defendant has a duty to disclose when (1) the omission is material; (2) the defect is central to the product's function; and (3) at least one of the [*LiMandri*] factors is met[.]

*In re Apple Inc. Device Performance Litig.*, 386 F. Supp. 3d 1155, 1176 (N.D. Cal. 2019). The Court agrees with Judge Davila and applies the *Hodsdon* standard for determining a duty to disclose.

### b. Omissions

Plaintiffs had difficulty in their Consolidated Complaint, in their opposition to Intel's motion to dismiss, and at oral argument articulating the precise material omission or omissions that Intel should have disclosed. Plaintiffs allege that Intel should have disclosed that it sacrificed security for speed. Plaintiffs also assert that Intel should have disclosed that its processors have a "leaky" cache that makes the real values that Intel's speculative execution retrieves vulnerable to unauthorized access. In other words, Plaintiffs contend that Intel should have disclosed that its processors render secrets that are in the computer's memory vulnerable to side-channel attacks.

At oral argument, Plaintiffs referred to paragraph 222 in their Consolidated Complaint as setting forth the alleged omissions that Intel should have disclosed.[9]

Intel argues that Plaintiffs refer to many articles over the years discussing the fact that Intel's chips were vulnerable to side-channel attacks and that Plaintiffs have not expressly alleged that Intel concealed or suppressed this vulnerability. Plaintiffs concede that there was public knowledge that Intel's chips were vulnerable to side-channel attacks. Plaintiffs argue, however, that it was not known that Intel's processors retrieved real values during speculative execution instead of "dummy" values, like the processors made by Intel's competitors do. That difference, asserts Plaintiffs, is why Intel's chips are vulnerable to Meltdown and Foreshadow and the chips of AMD and others are not.

The Consolidated Complaint is not all that clear on the difference between Intel retrieving "real values" and its competitors retrieving "dummy values," although it does allege that Intel's competitors are not subject to Foreshadow and Meltdown. The Consolidated Complaint also does not specifically allege that Intel's processors retrieve "real values" during speculative execution. Instead, Plaintiffs use descriptions like Intel's speculative execution "created windows of time during which an unauthorized user could have the processor make unnecessary or unauthorized memory accesses to copies of sensitive or privileged information."

_____

[9] Plaintiffs allege in paragraph 222 of their Consolidated Complaint: "Unbeknownst to consumers, Intel sacrificed security for speed. Specifically, and as explained herein, Intel's implementation of Dynamic Execution created security vulnerabilities within its CPUs, rendering them defective. For example, Intel undermined the security of its processors by implementing [out of order execution] and speculative execution in a way that (i) created windows of time during which an unauthorized user could have the processor make unnecessary or unauthorized memory accesses to copies of sensitive or privileged information and (ii) allowed that information (or critical data about the location or contours of that information) to remain in the CPUs' caches after the mistaken or unauthorized access (e.g., an exception) was discovered."

Consol. Compl. ¶ 222. The Consolidated Complaint does, however, refer to "fetching data," "privileged data," "data contained in the cache," "cache that now contains the secret data," "the ability to speculatively access data in the L1 cache," and "the malicious guest can speculatively read any cached memory, including secret data belonging to other virtual machines or the hypervisor itself." Considering these references in context and the Consolidated Complaint as a whole, Plaintiffs' allegations sufficiently allege that Intel's CPUs retrieve real values.

As Plaintiffs noted at oral argument, this alleged omission is their alleged Flaw One. It is one of the two key defects Plaintiffs allege Intel should have disclosed. The Court finds that Plaintiffs have not sufficiently alleged that Intel suppressed or concealed Flaw Two. Further, because it was known in the industry, it is not a material omission. Flaw One, however, does not appear to have been publicly known or otherwise disclosed. Plaintiffs have sufficiently alleged that Intel concealed or suppressed this fact.

### c.  Materiality

Although Intel did not dispute materiality in its motion or reply, at oral argument Intel asserted that Plaintiffs fail to allege materiality. Intel argued that Plaintiffs' allegations do not plausibly support that any Named Plaintiff would have considered this information important. Indeed, Intel argues, several Plaintiffs bought devices with Intel processors *after* the alleged defects and alleged omitted information became publicly known.

"'[M]ateriality usually is a question of fact' that should be left to the jury unless the statement at issue is 'obviously unimportant.'" *Beyer v. Symantec Corp.*, 333 F. Supp. 3d 966, 978 (N.D. Cal. 2018) (alteration in original) (quoting *Gutierrez*, 19 Cal. App. 5th at 1262). Although the Court requires more allegations from Plaintiffs about their expectations and alleged bargain relating to the security vulnerabilities, the Court cannot conclude that the alleged omissions are "obviously unimportant." The alleged security vulnerabilities, although theoretical,

PAGE 33 – OPINION AND ORDER

involve the potential to access confidential information on computing devices that hold a user's most sensitive data. At this stage of the litigation, Plaintiffs' allegations sufficiently allege materiality.

### d. Duty to disclose

Intel had a duty to disclose if the omissions were material, related to a central defect, and at least one of the *LiMandri* factors was present. The Court has already found that the alleged omission was material. In discussing the central functionality test, the Ninth Circuit noted that "the central functionality of the product is not based on subjective preferences about a product. A computer chip that corrupts the hard drive, or a laptop screen that goes dark, renders those products incapable of use by any consumer[.]" *Hodsdon*, 891 F.3d at 864. Plaintiffs allege that one of the alleged flaws has existed in Intel's CPUs since 1995 and the other since 2006. Consumers have thus been using devices with Intel's microprocess that included one of the alleged defects for more twenty years and the other alleged defect (or both) for more than 10 years. The alleged omission relates to Flaw One, alleged to have been in Intel's microprocessors since 2006.

Plaintiffs do not allege that Intel's microprocessors corrupt the hard drive, destroy data, cause the computer to freeze or stop functioning, cause the hard drive to crash, or do anything similar. Plaintiffs allege only that Intel's processor design makes the computer vulnerable to potential security breaches. Plaintiffs, however, do not allege that any data breach has already occurred. Much like these allegations being insufficient to show that the microprocessors were not fit for their ordinary purpose, the allegations do not go to the central functionality of a microprocessor and do not show that the chips were incapable of use. To the contrary, Plaintiffs' allegations show that they and others have been extensively using Intel's chips despite the alleged defect.

PAGE 34 – OPINION AND ORDER

Plaintiffs' remaining allegations relating to the performance of the microprocessors are that the security patches implemented to fix the defect may cause some devices to lose up to 30 percent in performance speed. No Named Plaintiff, however, makes any specific allegation relating to the degradation of performance with any specific device. DK Systems, the only Named Plaintiff to allege any degradation of performance, does not quantify the alleged reduction in speed that it has experienced or allege that the reduction in speed caused DK Systems to stop using its servers or computers or to replace them. The Court, therefore, cannot interpret Plaintiffs' allegations as plausibly showing that an alleged decrease in performance was central to the functionality of any Named Plaintiff's CPU or rendered it incapable of use. Because Plaintiffs' allegations do not show that the alleged defects were central to the functionality of Intel's microprocessors, the Court does not reach whether any of the *LiMandri* factors apply or whether Plaintiffs sufficiently alleged reliance for these claims.

## 2. Constructive Fraud

Plaintiffs allege constructive fraud. To state a claim for constructive fraud under California law, a plaintiff must allege "(1) a fiduciary or confidential relationship; (2) an act, omission or concealment involving a breach of that duty; (3) reliance; and (4) resulting damage." *Dealertrack, Inc. v. Huber*, 460 F. Supp. 2d 1177, 1183 (C.D. Cal. 2006) (citing *Assilzadeh v. California Fed. Bank*, 82 Cal. App. 4th 399, 414 (2000) ("Constructive fraud is a unique species of fraud applicable only to a fiduciary or confidential relationship.")). The Court has already found that the alleged omission was material. Intel argues that Plaintiffs do not adequately allege reliance, that Plaintiffs allege no fiduciary or confidential relationship, and that the economic loss rule precludes Plaintiffs' claims for common law and constructive fraud.

### a.  Reliance

Under California law, reliance "can be proved in a fraudulent omission case by establishing that had the omitted information been disclosed, [the plaintiff] would have been aware of it and behaved differently." *Hoffman v. 162 N. Wolfe LLC*, 228 Cal. App. 4th 1178, 1193-94 (2014) (alteration in original; quotation marks omitted). Whether a plaintiff "would have behaved differently can be presumed, or at least inferred, when the omission is material." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015).

Intel argues that although it can be presumed that Plaintiffs would have behaved differently if the omission were material, Plaintiffs allege no facts showing that they would have been *aware of* the omitted information if Intel had disclosed it, such as having viewed Intel advertisements, websites, or brochures that could have contained the information. Plaintiffs respond that their allegations that they expected Intel's processors to function as advertised and represented are enough.

As another district court explained:

> What matters in an omission case under *Daniel* is whether the plaintiff had an opportunity to receive and therefore rely on the omitted information, not whether they actually received some other, irrelevant information. Although the actual receipt of some information from a defendant might tend to demonstrate that the plaintiff had an opportunity to receive additional information, it is not necessarily the only way to establish such an opportunity.

*Sloan v. Gen. Motors LLC,* 287 F. Supp. 3d 840, 875 (N.D. Cal. 2018), *order clarified*, 2018 WL 1156607 (N.D. Cal. Mar. 5, 2018). Thus, the fact that Plaintiffs do not allege that they specifically received or reviewed information from Intel does not answer whether Plaintiffs would have learned of the alleged omission had Intel timely disclosed it.

Plaintiffs allege that Intel should have disclosed the information that is now known, although information continues to be discovered about the specific details of the publicized

PAGE 36 – OPINION AND ORDER

vulnerabilities of Intel's microprocessors. Plaintiffs cite many public articles and disclosures in their Consolidated Complaint relating to the specifics of the alleged defects, including Spectre, Meltdown, and Foreshadow. These became well known publicly, and it is plausible that had Intel disclosed similar information instead of journalists and other third parties, it would have been as publicly known. Plaintiffs also allege that they expected Intel's processors to function as advertised and represented. At this stage of the litigation, these allegations are enough to allege reliance.

### b.  Fiduciary or Confidential Relationship

A fiduciary or confidential relationship "ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he or she voluntarily accepts or assumes to accept the confidence, can take no advantage from his or her acts relating to the interest of the other party without the latter's knowledge or consent." *Barbara A. v. John G.*, 145 Cal. App. 3d 369, 382 (1983) (alterations and quotation marks omitted). Like a fiduciary relationship, the essence of a confidential relationship is "that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." *Richelle L. v. Roman Catholic Archbishop*, 106 Cal. App. 4th 257, 271 (2003) (quotation marks and citations omitted). The vulnerability of the weaker party has been described as a "necessary predicate of a confidential relation." *Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 1161 (2005) (quotation marks and citation omitted). In general, "the [confidential] relationship is not created simply by the receipt of confidential information." *Richelle L.*, 106 Cal. App. 4th at 272 n.6 (citing *Barajas v. Oren Realty & Development Co.*, 57 Cal. App. 4th 209 (1997)). "Generally, the existence of a confidential relationship is a question of fact for the jury or the trial court." *Barbara A.*, 145 Cal.

PAGE 37 – OPINION AND ORDER

App. 3d at 383. When, however, "the allegations of fact, if true, would be legally insufficient to establish a confidential relationship, dismissal is appropriate." *Patriot Sci. Corp. v. Korodi*, 504 F. Supp. 2d 952, 966 (S.D. Cal. 2007) (citing *Younan v. Equifax Inc.*, 111 Cal. App. 3d 498, 517 (1980)).

Intel argues that Plaintiffs fail to allege a fiduciary or confidential relationship because Plaintiffs do not allege facts supporting *any* relationship between them and Intel. Intel also argues that ordinary consumer transactions do not support a confidential relationship, particularly not between a component part manufacturer and a retail consumer. Plaintiffs respond that the existence of a confidential relationship is generally a question of fact and a challenge to this relationship is premature on a motion to dismiss. Plaintiffs also argue that given the highly technical and complicated nature of the product and alleged defects, Plaintiffs were vulnerable to Intel and its superior knowledge and relied on Intel to make full disclosure of all material facts.

"[A] fiduciary relationship is a recognized legal relationship such as guardian and ward, trustee and beneficiary, principal and agent, or attorney and client, whereas a 'confidential relationship' may be founded on a moral, social, domestic, or merely personal relationship as well as on a legal relationship." *Barbara A.*, 145 Cal. App. 3d at 383 (citation omitted). Nonetheless, courts have still required some factual allegations that support the contention that consumer plaintiffs placed trust in the defendant and relied on representations of the defendant. *See, e.g.*, *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1337 (N.D. Ga. 2019) (finding no confidential relationship and thus no duty to disclose because "the vast majority of the Plaintiffs do not even allege that they were in an arms-length transaction with Equifax. Instead, most of the Plaintiffs had no relationship with Equifax. Absent such a relationship, even with these statements touting its cybersecurity, Equifax was under no general

PAGE 38 – OPINION AND ORDER

duty to disclose to the entire world"); *Cole v. Chevron USA, Inc.*, 554 F. Supp. 2d 655, 672 (S.D. Miss. 2007) (finding no confidential relationship and dismissing claims because "nothing in the plaintiffs' allegations suggests the existence of a confidential relationship with the defendants" and "the Complaint cannot even be construed to allege that the plaintiffs purchased gasoline from the defendants"); *Witherspoon v. Philip Morris Inc.*, 964 F. Supp. 455, 461 (D.D.C. 1997) (dismissing constructive fraud claims and finding no confidential relationship despite allegations that the manufacturer-consumer relationship "'far exceeded the normal consumer relationship' due to the length of time, promotional literature mailed, television advertisements, and 'personalized mail sent directly to [the plaintiff]'"); *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 500-01 (1996) (affirming trial court's finding of no confidential relationship or "situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff" because the "the complaint merely alleged that plaintiffs had purchased [their cars] from an authorized Suzuki dealer, and that Suzuki manufactured and distributed [those cars]," and that Suzuki had concealed the alleged defect, and thus the plaintiffs had not "sufficiently allege[d] that they were in a confidential or fiduciary relationship with Suzuki, or that Suzuki was in a position of superiority over them").

Plaintiffs' Consolidated Complaint contains no allegations of any relationship between Plaintiffs and Intel. Plaintiffs do not allege that they placed their trust in Intel or that they were vulnerable to Intel. Plaintiffs also do not allege that they read any representation by Intel, heard any advertisement by Intel, visited Intel's website to review information, or relied on any statement by Intel to discover information or inform or reassure themselves about the security aspects of their microprocessors or computers. Nor do Plaintiffs allege how Intel accepted or can be presumed to accept the trust and confidence of every retail customer of its processors (or of

PAGE 39 – OPINION AND ORDER

Plaintiffs specifically), or how it exerts a "unique influence" over every retail customer (or of Plaintiffs specifically). *Richelle L.*, 106 Cal. App. 4th at 271; *Barbara A.*, 145 Cal. App. 3d at 382. Plaintiffs merely allege that they expected Intel's processors to work as advertised and represented and to secure adequately data from exploits. These allegations do not show a confidential relationship. Although the Court finds that Plaintiffs have sufficiently alleged reliance for their fraud claims, the bar is higher to allege a confidential relationship. Plaintiffs' allegations lack the requisite connection between Intel and Plaintiffs. Plaintiffs, therefore, fail to allege a fiduciary or confidential relationship.

### c. Economic Loss Rule

Under California law, "[e]conomic loss consists of 'damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damages to other property.'" *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004) (quoting *Jimenez v. Superior Court*, 29 Cal. 4th 473, 482 (2002)). As explained by the California Supreme Court:

> Simply stated, the economic loss rule provides: [W]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "economic" losses. This doctrine hinges on a distinction drawn between transactions involving the sale of goods for commercial purposes where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by resort to the law of torts. The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise. Quite simply, the economic loss rule prevent[s] the law of contract and the law of tort from dissolving one into the other.

*Id.* (quotation marks and citations omitted) (alterations in original). The economic loss rule applies to fraud claims, although there are exceptions.

PAGE 40 – OPINION AND ORDER

In *Robinson*, the California Supreme Court discussed several circumstances in which a plaintiff may bring a tort claim along with a contract claim. *Id.* at 989-990. The court also discussed public policy reasons for allowing "independent" fraud claims to proceed even if there is only economic loss. *Id.* at 991-992. The court held, however, that it was carving out a "narrow" exception for "a defendant's affirmative misrepresentations on which a plaintiff relies and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss." *Id.* at 993.

Courts, however, have relied on the discussion in *Robinson* to extend its holding. *See, e.g.*, *Mirrafati v. Anari*, 2018 WL 6599825, at *7 (Cal. App. 4th Dec. 17, 2018) ("Anari and Danayan claim *Robinson*, which held the economic loss rule did not bar a fraud claim, is distinguishable because the 'defendant's conduct [in Robinson] was intentional, independent of the contract, and could have led to . . . concomitant personal liability.' Although the *Robinson* court suggested its decision was a narrow one, we find its explicit limits do not exclude Mirrafati's fraud cause of action. As the court explained, '[i]n pursuing a valid fraud action, a plaintiff advances the public interest in punishing intentional misrepresentations and in deterring such misrepresentations in the future. Because of the extra measure of blameworthiness inhering in fraud, and because in fraud cases we are not concerned about the need for predictability about the cost of contractual relationships, fraud plaintiffs may recover "out-of-pocket" damages in addition to benefit-of-the bargain damages. In addition, California also has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices.' We accordingly find the economic loss rule does not bar Mirrafati's fraud claims." (quoting *Robinson*, 34 Cal. 4th at 992)); *United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1181 (C.D. Cal. 2009) (noting that California's economic loss rule has

exceptions for claims involving personal injury, damage to other property, and a "breach of a noncontractual duty. . . . a tort duty apart from the general duty not to act negligently," which requires focusing on "intentional conduct" (citing cases)); *Cty. of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 329 (2006) ("The analysis that followed [in *Robinson*] suggested that fraud itself is immune from application of the economic loss rule because fraud is particularly blameworthy and therefore unlike both contract causes of action and products liability causes of action. Although the court suggested that its decision was a narrow one, its explicit limits did not exclude a fraud cause of action such as the one pleaded by plaintiffs.").

The Court agrees that the discussion in *Robinson* supports applying its holding when a plaintiff alleges an intentional fraud that is independent of any contractual duty. *See, e.g.*, *Food Safety Net Services v. Eco Safe Sys. USA, Inc.* (2012) 209 Cal. App. 4th 1118, 1130 (2012) (noting that to avoid the economic loss rule, a plaintiff "alleging fraud or deceit in connection with a contract must establish tortious conduct independent of a breach of the contract itself, that is, violation of some independent duty arising from tort law." (footnote omitted)). Material omissions may qualify as intentional conduct and support a fraud claim that is separate from a contractual duty and involves different or additional harm. *See, e.g.*, *Dairy v. Harry Shelton Livestock, LLC*, 2019 WL 631493, at *10-11 (N.D. Cal. Feb. 14, 2019) (denying motion to dismiss under the economic loss rule the plaintiff's fraudulent concealment claim, and noting that "[w]here contract actions enforce the intentions of the parties to the agreement, tort actions are primarily concerned with the vindication of social policy"); *Mark Tucker, Inc. v. Cathy Jean Inc.*, 2016 WL 10988799, at *5 (C.D. Cal. Sept. 16, 2016) (denying motion to dismiss under the economic loss rule the plaintiff's fraudulent concealment claim because "the tort claim and the contract claims are independent"); *Bentham v. Bingham Law Grp.*, 2013 WL 12186171, at *12

(S.D. Cal. Nov. 15, 2013) ("As to Bentham's claim for fraudulent concealment, the *Robinson* court specifically acknowledged that where fraud or conversion accompanies a breach of contract, the economic loss rule does not bar the tort claim. *See Robinson*, 34 Cal. 4th at 990. As explained above, the Court finds that Bentham has sufficiently alleged a claim against BLG for fraudulent concealment. As such, a claim based in fraud accompanies Bentham's breach of contract claim, and the economic loss doctrine does not bar Bentham's claim for fraudulent concealment.").

Plaintiffs allege that Intel knew about security vulnerabilities that put Plaintiffs' most confidential and sensitive information at risk yet failed to disclose that information until third parties discovered it. Plaintiffs also contend that this alleged deception had been continuing for many years. The court in *Robinson* specifically noted that "California also has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices" and that "fraudulent conduct cannot be considered a socially useful business practice." *Robinson*, 34 Cal. 4th at 992 (quotation marks omitted). Under these circumstances, allowing Plaintiffs' fraud claim to proceed "discourages such practices in the future while encouraging a business climate free of fraud and deceptive practices." *Id.* (quotation marks omitted). As discussed above, however, Plaintiffs fail to state a claim for fraud or constructive fraud. Thus, they have not alleged an independent tort. If Plaintiffs can cure the deficiencies identified and state a claim for fraud or constructive fraud in an amended pleading, the economic loss rule would not bar Plaintiffs' fraud claims.[10]

---

[10] The Court rejects Plaintiffs' argument that they have sufficiently pleaded that the alleged defects harmed property other than the microprocessors themselves. Plaintiffs assert general allegations about the patches issued to resolve the alleged defects, including that they caused data corruption and loss and that they degraded performance. The Named Plaintiffs, however, do not allege that *they* suffered from any data corruption or loss. Nor do any of them,

**D. Nationwide Claim—UCL Unlawful or Unfair Practice**

California's UCL is written in the disjunctive and "establishes three varieties of unfair competition–acts or practices which are unlawful, or unfair, or fraudulent." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). "The statutory language referring to 'any unlawful, unfair or fraudulent' practice makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law . . . . In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa.'" *Id.* (citations omitted). As discussed above, Plaintiffs fail to plead a UCL claim under the "fraud" prong. The Court now turns to the "unlawful" and "unfair" prongs of the UCL.

**1. Unlawful**

By proscribing "unlawful" acts or practices, "the UCL borrows violations of other laws and treats them as unlawful practices that the UCL makes independently actionable." *Gutierrez*, 19 Cal. App. 5th at 1265. "[V]irtually any law or regulation—federal or state, statutory or common law—can serve as [a] predicate for a . . . [section] 17200 'unlawful' violation.'" *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1383 (2012), *as modified on denial of reh'g* (Feb. 24, 2012) (alterations in original) (quoting *Paulus v. Bob Lynch Ford, Inc.*, 139 Cal. App. 4th 659, 681 (2006)). Because Plaintiffs fail adequately to allege a violation of another law, Plaintiffs fail to allege a violation of the "unlawful" prong of the UCL.

---

except DK Systems, allege that they suffered any decline in performance. Moreover, DK Systems' allegation about system performance is vague. Plaintiffs have thus not sufficiently alleged damage to their "other" property. *See Stewart v. Electrolux Home Prod., Inc.*, 304 F. Supp. 3d 894, 902 (E.D. Cal. 2018) ("The 'other' damage Plaintiffs allege is simply too vague and conclusory to credit as true. Plaintiffs note they alleged damage to the oven and other property in light of resulting fire danger from the defect, but Plaintiffs do not allege *they* suffered any fire damage or that their oven posed a fire threat or hazard related to the oven's thermostat defect." (emphasis in original) (citation omitted)).

### 2. Unfair

"[T]he proper definition of 'unfair' conduct against consumers 'is currently in flux' among California courts." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012). The California appellate courts have articulated three tests for defining "unfair." *See Dram v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010). First, the "balancing test" asks whether the alleged practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim. *Id.* This was the original test applied in California.

The second test is the "tethering test," which requires that the public policy that is a predicate to a consumer unfair competition action be tethered to specific constitutional, statutory, or regulatory provisions. *Dram*, 182 Cal. App. 4th at 257. This test stems from the California Supreme Court's discussion in *Cel-Tech*, even though the court noted that its holding did not apply to cases involving consumer claims or alleged fraudulent conduct. 20 Cal. 4th at 187 n.12 ("This case involves an action by a competitor alleging anticompetitive practices. Our discussion and this test are limited to that context. Nothing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law such as 'fraudulent' or 'unlawful' business practices or 'unfair, deceptive, untrue or misleading advertising.' We also express no view on the application of federal cases such as *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972) that involve injury to consumers and therefore do not relate to actions like this one.").

The third test incorporates the definition of "unfair" from the Federal Trade Commission Act ("FTC Act") and requires that: (1) the consumer's injury be substantial; (2) the injury not be outweighed by any countervailing benefits to consumers or competition; and (3) the injury is one

PAGE 45 – OPINION AND ORDER

that consumers could not have reasonably avoided. *Dram*, 182 Cal. App. 4th at 257 (citing 15 U.S.C. § 45(5)(n)); *see also Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 612 (2014) (discussing the three tests). Shortly after the California Court of Appeal first adopted this test, the Ninth Circuit "decline[d] to apply the FTC standard in the absence of a clear holding from the California Supreme Court." *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007) (alteration added). Although the California Court of Appeal has continued to apply the FTC Act test, as well as the other two tests, in the ensuing years, the parties did not argue for applying the FTC Act test. Thus, the Court need not consider the viability of the FTC Act test. Considering the balancing and tethering tests, the California Supreme Court's comments in *Cel-Tech*, and the California Court of Appeal cases that have followed, the Court applies the balancing test.

Plaintiffs argue that they have alleged a claim under the balancing test. Plaintiffs assert that they have alleged significant injury—the loss of the benefit of their bargain, the vulnerability of their confidential data to a security breach, and the requirement that they download patches that cause a reduction in the performance of their CPUs.[11] Plaintiffs also argue that their injury is not outweighed by any utility because Plaintiffs allege that Intel was motivated by profit, could have corrected the defects, and the CPUs of Intel's competitors are not subject to many of the same vulnerabilities.

Intel responds that because Plaintiffs have not alleged a duty to disclose, their "unfair" claim fails because the failure to disclose something one is not required to disclose cannot be substantially injurious. Intel cites *Hodsdon*. In *Hodsdon*, however, the Ninth Circuit noted that

---

[11] As mentioned above, the Court notes that only DK Systems has alleged any reduction in performance. Thus, that aspect of the alleged injury is not adequately alleged for the other Named Plaintiffs.

"[u]nlike the other two UCL prongs, the lack of a duty to disclose *does not* necessarily dispose of claims under the unfair prong." 891 F.3d at 865-66 (emphasis added). The court found that the defendant's "failure to disclose information it had no duty to disclose in the first place is not substantially injurious, immoral, or unethical." *Id.* at 866. The court explained, however, that the alleged conduct was not immoral because although underlying use of slave labor was immoral, the failure to disclose it on the label of a chocolate bar was not immoral, especially without a duty to disclose that information and the information was already disclosed under the Supply Chains Act. *Id.* The court also explained that the alleged conduct was not substantially injurious because the defendant had no specific duty to disclose the information, the information was disclosed under the Supply Chains Act, and the information was publicly available, including on the defendant's website. *Id.* Thus, the mere fact that a defendant does not have a duty to disclose information does not decide whether the alleged conduct is substantially injurious, immoral, unethical, or otherwise meets the balancing test, although it is a factor to be considered.

Intel also argues that when the conduct underlying the alleged "unfair" conduct completely overlaps with the conduct underlying the alleged "fraudulent" conduct and the fraud claims are dismissed, claims under the "unfair" prong of the UCL must also be dismissed. Intel cites *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074 (2017). Although *Hadley* references that "courts in this district have held that where the unfair business practices alleged under the unfair prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL do not survive," a review of *Hadley* and the cases it cites provides further context to this statement. *Id.* at 1104-05. These cases dismiss the "unfair" claim when the "fraudulent" claim is dismissed for a reason that applies to both claims. *See, e.g.*, *id.* at 1105

PAGE 47 – OPINION AND ORDER

(failure to comply with Rule 9(b)); *Punian v. Gillette*, 2016 WL 1029607, at *17 (N.D. Cal. Mar. 15, 2016) (failure to allege a material omission); *In re Actimmune Mktg. Litig.*, 2009 WL 3740648, at *14 (N.D. Cal. Nov. 6, 2009) (failure to comply with Rule 9(b)). Because Plaintiffs' fraud claims were dismissed for failing to allege that Intel had a duty to disclose, which is not required for an "unfair" claim under that prong of the UCL, the fact that these claims overlap and the fraud claims were dismissed does not require the dismissal of the unfair claim. *Cf. Henryhand v. Dorel Juvenile Grp., Inc.*, 2017 WL 7806590, at *7 (C.D. Cal. Oct. 5, 2017) (dismissing claims under the CLRA, FAL, and fraudulent prong of the UCL but denying motion to dismiss claim under the "unfair" prong of the UCL even though all claims were based on the same allegations).

The balancing test is factually intensive and generally not appropriate to resolve on a motion to dismiss. *See McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006) ("[T]he determination whether [a practice] is unfair is one of fact which requires a review of the evidence from both parties. . . . It thus cannot usually be made on demurrer." (citation omitted)). At this stage of the litigation, the Court merely evaluates whether Plaintiffs plausibly allege the requisite factors, accepting Plaintiffs' allegations as true. The Court first considers whether Plaintiffs plausibly allege a significant injury. Plaintiffs allege that their most sensitive and confidential data is vulnerable to a data breach. Plaintiffs also allege that Intel issued many "patches" to fix this problem and that those patches have decreased performance in computers and servers up to 30 percent. That Intel issued many patches, particularly patches that create a significant decrease in performance, supports the plausibility of Plaintiffs' allegations of substantial injury. If there was no risk of Plaintiffs' confidential data being breached, then Intel likely would not be issuing these patches.

PAGE 48 – OPINION AND ORDER

Plaintiffs also allege that the National Cybersecurity and Communications Integration Center, which is part of the U.S. Department of Homeland Security, issued a warning bulletin about the Meltdown and Spectre vulnerabilities and that the U.S. Department of Health and Human Services similarly provided warnings about Meltdown and Spectre to businesses covered by the Health Insurance Portability and Accountability Act and cautioned those businesses to maintain the privacy and security of patient health information. These warnings, involving identified possible attacks that exploit the defects alleged by Plaintiffs, support the plausibility of Plaintiffs' alleged injury. Although Plaintiffs allege that there was public disclosure of some of the alleged defects, it is a sophisticated and specialized disclosure in technical publications and patents. It is not the readily available and comprehensible type of disclosure that was discussed in *Hodsdon*.

As discussed above relating to standing to seek monetary relief, Plaintiffs did not adequately allege diminution in the value of their devices or benefit-of-the-bargain injury. If Plaintiffs can adequately allege diminution in value or benefit-of-the bargain damages, Plaintiffs would adequately allege that Intel's conduct was substantially injurious.

Plaintiffs also allege that Intel intentionally sacrificed security for speed and did so to increase its profits. Plaintiffs further allege that Intel knew about the vulnerabilities and did not disclose them and knew ways it could reduce the vulnerabilities but did not implement them because it would reduce speed and reduce profits. Additionally, as alleged by Plaintiffs, Intel's products suffer from vulnerabilities that other manufacturer's processors do not experience because of Intel's specific design choices. Plaintiffs allege that Intel set aggressive performance standards and focused on performance so much so that it continued to increase its use of out-of-order execution, speculative execution, and branch prediction. These allegations plausibly

PAGE 49 – OPINION AND ORDER

support that the benefits of the alleged conduct do not outweigh the alleged harm. Thus, if

Plaintiffs adequately allege standing, they adequately allege an "unfair" UCL claim.

**E.  Nationwide Claim—Quasi-Contract or Unjust Enrichment**

Several divisions of the California Court of Appeal have reached different conclusions

when addressing claims for "unjust enrichment." As summarized in one appellate opinion:

> Some courts state that there is no cause of action for unjust
> enrichment in California. Other courts recognize such a cause of
> action. Some courts state that unjust enrichment is synonymous
> with restitution and recognize a cause of action for restitution
> based on unjust enrichment. Regardless of how the cause of action
> is labeled, California courts hold that a person who is unjustly
> enriched at the expense of another is liable for restitution.

*Himelsein Mandel Fund Mgmt., LLC v. Fortress Inv. Grp. LLC*, 2019 WL 1395963, at \*14 (Cal.

Ct. App. Mar. 28, 2019), *review denied* (July 17, 2019).

The Ninth Circuit, citing one line of California appellate cases, noted that in California

"there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with

'restitution.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). The Ninth

Circuit noted that unjust enrichment and restitution relate to quasi-contract claims, and that

"[w]hen a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a

quasi-contract claim seeking restitution.'" *Id.* (quoting *Rutherford Holdings, LLC v. Plaza Del

Rey*, 223 Cal. App. 4th 221, 231 (2014)).

A review of California appellate cases shows that a majority of cases accept a claim for

unjust enrichment. They note "[t]he elements of a cause of action for unjust enrichment are

simply stated as 'receipt of a benefit and unjust retention of the benefit at the expense of

another.'" *See, e.g.*, *Prof'l Tax Appeal v. Kennedy-Wilson Holdings, Inc.*, 29 Cal. App. 5th 230,

238 (2018) (quoting *Lectrodryer v. Seoulbank*, 77 Cal. App. 4th 723, 726 (2000) (citation

omitted)). "The theory of unjust enrichment requires one who acquires a benefit which may not

PAGE 50 – OPINION AND ORDER

justly be retained, to return either the thing or its equivalent to the aggrieved party so as not to be unjustly enriched." *Otworth v. Southern Pac. Transp. Co.*, 166 Cal. App. 3d 452, 460 (1985). "It is not, strictly speaking, a theory of recovery, 'but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so.'" *Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1132 (2014), *as modified on denial of reh'g* (quoting *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003).

Plaintiffs allege that they did not receive the benefit of their bargain when they bought their CPUs and that Intel unjustly retained the benefit of the purchase price of Plaintiffs' CPUs. As discussed above, if Plaintiffs adequately allege standing, Plaintiffs could sufficiently allege that Intel's conduct violated the "unfair" prong of the UCL. Plaintiffs allege that Intel sacrificed security for speed, knew about the security vulnerabilities, knew about methods to fix the security vulnerabilities, and chose not to disclose the vulnerabilities or implement the fixes because it would reduce profits. Plaintiffs also allege Intel did not disclose or fix the vulnerabilities until third parties discovered ways to exploit the flaws, and then Intel has implemented many patches that have significantly adversely affected the performance of Intel's microprocessors. No matter how the claim is labelled, Plaintiffs' allegations could be sufficient to allege an unjust enrichment or quasi-contract claim seeking the remedy of restitution, if Plaintiffs adequately allege standing. *See Astiana*, 783 F.3d at 762; *Prakashpalan*, 223 Cal. App. 4th at 1132.

## F.  State Subclass Claims

Intel argues that Plaintiffs fail to state a claim under the state subclass claims, which are brought under the consumer protection laws of all states but California and Massachusetts, plus the District of Columbia and the U.S. Virgin Islands. Intel submits an Appendix purporting to set out a chart of requirements of each state's relevant consumer protection law, with many cases

PAGE 51 – OPINION AND ORDER

listed and no argument, discussion, or even parentheticals. The Court also notes that inclusion of the Appendix exceeded the 50-page limitation set by the Court.

The Court will not separately consider Intel's Appendix as raising any argument or legal requirement that the Court should analyze. The Court only considers as adequately presented the arguments in Intel's brief and made at oral argument for why the Court should dismiss Plaintiffs' state law claims. *See, e.g.*, *Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (noting that federal courts do not "manufacture arguments for an appellant" or "consider any claims that are not actually argued"); *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994) ("We will not manufacture arguments for [a litigant], and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review."); *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1036 (C.D. Cal. 2018) ("The Court's role is not to make or develop arguments on behalf of the parties, and Plaintiffs' failure to present cogent arguments is enough to deny these objections.").

Intel argues that Plaintiffs' allegations do not show that Intel engaged in deceptive, unfair, or unconscionable conduct, required under the various statutes. Intel also argues that because no Named Plaintiff lives in the U.S. Virgin Islands, no one has standing to bring claims under that statute. Intel further argues that because the statutes in Hawaii, Maine, Minnesota, and Nebraska provide for only injunctive relief and Plaintiffs fail to allege future harm that must be avoided, Plaintiffs lack standing to bring those claims.

### 1. Deceptive Practices

#### a. Statutes modelled on the FTC Act

Intel argues that Plaintiffs fail to state a claim based on alleged omissions for the 27 states that have statutes based on the FTC Act. These statutes prohibit unfair or deceptive acts or practices. A deceptive act or practice requires an omission, representation, or practice that is

material and "likely to mislead consumers acting reasonably under the circumstances." *See FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001).

Intel argues that Plaintiffs are asserting a "pure omissions" claim. Plaintiffs, however, allege that Intel made statements that plausibly can be construed as misrepresentations or "half-truths." Plaintiffs allege that in 2015 Intel touted its "cutting edge security," claiming that its microarchitecture "has been designed to enable better security," including "at home." Consol. Compl. ¶ 217. Plaintiffs also allege that Intel asserted that consumers were "safe and secure at home," "knowing all of [their] pictures, videos, and personal files [were] securely stored at home." *Id.* Plaintiffs further allege that Intel claimed that its processors had "hardware-based security features [that] help keep your system and data free from malware, hacking, viruses, and prying eyes." *Id.* Plaintiffs allege that Intel noted the importance of protecting "sensitive data" and "represented to users that its CPUs were 'secure to the core.' . . . and asserted that Intel's processors 'stand out' by 'extending protection outside the operating system and into the hardware layer." *Id.* at ¶ 218. Plaintiffs also allege that Intel represented that it recognized that software alone could not keep up with the advancing threats to confidential data and thus Intel designed "hardware-enabled security capabilities" directly into its processor, allowing the CPU to protect the computing ecosystem "against evolving and modern threats." *Id.* at ¶ 219. Plaintiffs allege within their various state law claims that Intel made "affirmative public representations" or other "representations" and that the claims are based on Intel's "misrepresentations and omissions."

These alleged representations are more than mere puffery. Thus, Plaintiffs' allegations are sufficient at this stage of the litigation to support more than an omissions claim on Plaintiffs'

PAGE 53 – OPINION AND ORDER

state law consumer protection claims.[12] Intel's "pure omissions" argument is, therefore, rejected. If Plaintiffs sufficiently allege standing, these allegations would sufficiently state a claim.

### b. No actionable omission states

Intel argues that Mississippi, Pennsylvania, Wisconsin, and one of the cited laws of Ohio all require an affirmative misrepresentation to support a claim under their consumer protection laws. Because Plaintiffs allege misrepresentations and half-truths along with omissions, the Court rejects Intel's argument.

Intel also cites the Mississippi statute as defining what constitutes deceptive practices and argues that it does not include omissions. Miss. Code. § 75-24-5(2). The first subsection of that statute, however, states that it precludes "unfair or deceptive trade practices." *Id.* § 75-24-5(1). The second subsection, relied on by Intel, begins with a clause not quoted by Intel, which states: "*Without limiting the scope of subsection (1)* of this section, the following unfair methods of competition and unfair or deceptive trade practices or acts in the conduct of any trade or commerce are hereby prohibited." *Id.* § 75-24-5(2) (emphasis added). Moreover, the Mississippi Supreme Court has noted "that Mississippi's Consumer Protection Act does not provide a definition of what is an 'unfair or deceptive trade practice' and therefore Mississippi courts look for guidance to federal courts interpreting the FTC Act." *Watson Labs., Inc. v. State*, 241 So. 3d 573, 590 (Miss. 2018). For these reasons, the Court rejects Intel's argument that Mississippi's consumer protection law does not include omissions.

---

[12] Plaintiffs stated in their opposition brief that their nationwide claims are not based on any affirmative misrepresentations, nor did Plaintiffs rely on those allegations in defending their nationwide claims. The Court therefore did not consider these allegations in evaluating Plaintiffs' FAL, CLRA, UCL, and constructive fraud claims. Plaintiffs, however, cite and rely on their allegations of affirmative misrepresentations for their state law claims.

As for Pennsylvania's UTPCPL, the Court also finds Intel's contention that the statute does not include omissions to lack merit. Pennsylvania courts have accepted omissions claims under this statute. *See, e.g.*, *Zwiercan v. Gen. Motors Corp.*, 58 Pa. D. & C.4th 251 (Com. Pl. 2002) (considering a claim brought by a consumer against a manufacturer, denying the manufacturer's motion for summary judgment, and noting in discussing the deceptive and unfair trade practices claim that "Pennsylvania law holds that the deliberate non-disclosure of a material fact is just as actionable as an intentional false statement"); *accord Com. v. Percudani*, 844 A.2d 35, *clarified on reconsideration*, 851 A.2d 987 (Pa. Commw. Ct. 2004) (involving omissions claim and allowing some claims to proceed); *Abrams v. Toyota Motor Credit Corp.*, 2001 WL 1807357, at *7 (Pa. Com. Pl. Dec. 5, 2001) (discussing the "catch-all" definition in Pennsylvania's statute and concluding that because the legislature amended the definition to add "deceptive" in addition to "fraudulent," a plaintiff does not have to prove all the elements of fraud, and also discussing omissions in evaluating whether the plaintiff adequately alleged a claim).

Regarding the Ohio Deceptive Trade Practices Act, Plaintiffs rely solely on the text of the statute, which uses the term "represents," the same as other state statutes that allow for claims based on omissions. Courts applying Ohio's statute have accepted omission and concealment allegations as properly alleging a claim. *See, e.g.*, *Arlington Video Prods., Inc. v. Fifth Third Bancorp*, 2008 WL 1990355, at *2 (S.D. Ohio May 1, 2008) ("Plaintiff contends that through Defendant's 'actions and failure to provide essential information to its customers, Defendant's concealment, suppression, and omission of material facts as to the services it provides to the public has caused harm to its uninformed customers.' On the basis of these facts, Plaintiff asserts claims against Defendant under the Ohio Deceptive Trade Practices Act and for unjust

enrichment." (citation omitted)). The Court thus rejects Intel's argument that Ohio's Deceptive

Trade Practices Act does not include claims based on omissions.[13]

As for Wisconsin's Deceptive Trade Practices Act, the Court agrees that it applies only to

advertising. Although Plaintiffs' allege the required elements—that Intel placed misleading

advertisements with the intent to sell or increase consumption of merchandise—these allegations

are conclusory. For supporting factual allegations, the Consolidated Complaint quotes and thus

incorporates by reference advertisements that plausibly can be construed, based on Plaintiffs'

allegations, as containing half-truths or misrepresentations. These documents also contain the

disclaimer that "no computer system can be absolutely secure" in fine print, but this disclaimer is

not all that noticeable and does not render the advertisement not misleading. Plaintiffs, however,

do not allege that Intel placed or used any of the alleged advertisements, or advertisements with

similar representations, in Wisconsin. As a result, Plaintiffs' Wisconsin state law claim fails.

### c.  Duty to disclose states

Intel asserts that seven states require Plaintiffs to allege a duty to disclose. Intel does not

discuss the factors each state evaluates in considering whether there is a duty to disclose. The

central functionality factor that the Court found dispositive in evaluating Plaintiffs' nationwide

---

[13] The Court notes that Intel did not challenge whether consumers have standing under Ohio's Deceptive Trade Practices Act, and thus this issue was not briefed and is not before the Court. Several courts, however, have held that consumers lack standing under this statute. *See, e.g.*, *In re Nexus 6P Prod. Liab. Litig.*, 293 F. Supp. 3d 888, 932 (N.D. Cal. 2018) (dismissing such claims for lack of standing, discussing cases); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 1006 (S.D. Cal. 2014), *order corrected*, 2014 WL 12603117 (S.D. Cal. Feb. 10, 2014) ("Therefore, because the Ohio Supreme Court has not addressed whether consumers have standing to bring suit under the ODTPA, and the 'vast majority of federal courts and all lower state courts to address the issue have concluded that relief under the [ODTPA] is not available to consumers," the Court finds Plaintiffs lack standing under the ODTPA.'" (quoting *Phillips v. Philip Morris Cos.*, 290 F.R.D. 476, 482 (N.D. Ohio 2013)).

claims and whether Plaintiffs had a duty to disclose was a test established by federal courts applying California law. Intel makes no argument and cites no case law that the central functionality test applies in Connecticut, Delaware, Kansas, Louisiana, Minnesota, Missouri, or Washington.[14] Intel also does not analyze the duty to disclose considering Plaintiffs' allegations of misrepresentations and half-truths. Intel therefore has not sufficiently presented its motion related to the duty to disclose in these seven states. Intel may, however, raise this argument against any amended consolidated complaint.

### d.  Intent states

Intel notes that 14 states require that for an omission to be actionable, a plaintiff must allege the defendant's intent to deceive or intent that consumers rely on the defendant's silence. Intel argues that because it discussed the side-channel vulnerability in its patent filings and developer reference guides, it did not have the requisite intent. As the Court found above, however, those disclosures related to Flaw Two and Intel failed to disclose Flaw One. Intel also argues that the disclaimer in its fact sheets, sales brochures, and advertisements that no computer system could be "absolutely secure" shows that it did not have the intent to deceive or that consumers should rely on its silence. This disclaimer, however, was in small print, often on the back side, and did not make the larger, front page statements not misleading. Plaintiffs also allege that Intel knew about specific security vulnerabilities. Intel's disclaimer that no system can be "absolutely secure" plausibly can be construed as misleading if, while making that statement, Intel knew about a specific security vulnerability. For these reasons, at this stage, Plaintiffs have sufficiently alleged intent.

---

[14] The Court found no case applying the central functionality test in analyzing a duty to disclose under the law of any of these states.

### e.  Reliance states

Intel contends that 11 states have a reliance requirement and that Plaintiffs fail to allege reliance. Intel provides no test for reliance for these states, relying instead on its arguments related to Plaintiffs' nationwide claims. As discussed above, the Court finds reliance adequately alleged under California law. Thus, the Court rejects Intel's arguments relating to reliance for these 11 states, without prejudice and with leave to renew if Intel believes there is a different test for reliance in any of these 11 states.

### f.  Kentucky

Intel argues that standing to bring a claim under Kentucky's Consumer Protection Act requires privity of contract and because there is no privity between Plaintiffs and Intel, claims under Kentucky's statute must fail. Plaintiffs respond that there is an exception to the privity requirement when "certain representations are made for the benefit of consumers." The exception, however, applies not when "certain representations" are made for the benefit consumers, but when an express warranty is made for the benefit of consumers. *See, e.g.*, *Bosch v. Bayer Healthcare Pharms., Inc.*, 13 F. Supp. 3d 730, 750 (W.D. Ky. 2014); *Naiser v. Unilever U.S., Inc.*, 975 F. Supp. 2d 727, 743 (W.D. Ky. 2013). For that reason, the Court rejects Plaintiffs' argument and concludes that Plaintiffs have not sufficiently alleged this claim.

### g.  Oklahoma

Intel argues that under Oklahoma's Consumer Protection Act ("OCPA"), a plaintiff must claim actual damages beyond the purchase price of the alleged product and that no such damages are alleged by the Oklahoma Named Plaintiff.[15] *See, e.g.*, *Walls v. Am. Tobacco Co.*, 11

---

[15] Intel also argues that Plaintiffs must allege a "manifested" defect. The Court rejects this argument. Intel cites *In re: Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *36 (S.D.N.Y. July 15, 2016), which cited *Harrison v. Leviton Mfg. Co.*, 2006 WL 2990524, at *5 (N.D. Okla. Oct. 19, 2006). The discussion in *Harrison* relating to the OCPA claim, however,

P.3d 626, 630 (Okla. 2006) ("Accordingly, a person may not bring an action as an aggrieved consumer under § 761.1(A) solely as a result of his or her payment of the purchase price for that product. An essential element of a claim under § 761.1(A) is actual injury or damage caused by a violation of the OCPA."); *In re: Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *36 (S.D.N.Y. July 15, 2016) (noting that *Walls* suggests "that Oklahoma does not recognize the benefit-of-the-bargain defect theory for OCPA claims" and that "Plaintiffs do not cite, and the Court is not aware of, any authority interpreting the OCPA that is to the contrary"). Plaintiffs respond that they allege that they suffered monetary damages.

Plaintiff Sarah Stone, from Oklahoma, alleges that she bought two computers that contained Intel CPUs. She also alleges that had she known the undisclosed information, she would not have purchased them or would have paid less. She does not allege that she has paid any monies to mitigate the allege defects, suffered any data loss, or suffered an injury other than the loss of the benefit of her bargain. Although Plaintiffs assert that she has alleged monetary damages sufficient to comply with Oklahoma law, it is unclear to what allegations they are referencing. Thus, the Court rejects Plaintiffs' argument, and Plaintiffs' OCPA claim fails.

---

does not support a requirement that a plaintiff allege a "manifested" defect. The discussion about when a defect manifests was relating to the claim for the implied warranty of merchantability. *Harrison*, 2006 WL 2990524, at *6. The discussion relating to the OCPA involved whether the product had caused an injury, not whether the product had manifested a defect. *Id.* at *5. Moreover, the Oklahoma Supreme Court has established that "the four elements of a consumer's private action under the OCPA are: (1) that the defendant engaged in an unlawful practice as defined at 15 O.S. (1991), § 753; (2) that the challenged practice occurred in the course of defendant's business; (3) that the plaintiff, as a consumer, suffered an injury in fact; and (4) that the challenged practice caused the plaintiff's injury." *Patterson v. Beall*, 19 P.3d 839, 846 (Okla. 2000). The Court declines to add another element.

### h. Oregon

Intel argues that the Oregon state law claims must be dismissed because Oregon's Unlawful Trade Practices Act ("UTPA") only applies to final consumer goods and does not apply to component part sellers like Intel. Intel also argues that Oregon's statute requires an "ascertainable loss of money or property" that the Oregon Named Plaintiffs have not alleged.

As for Plaintiffs' alleged injuries, Oregon allows for benefit of the bargain and diminished value damages in a UTPA claim. *See Simonsen v. Sandy River Auto, LLC*, 290 Or. App. 80, 85-91 (2018) (discussing cases, and concluding that "ascertainable loss is found in the difference between the value of the car as represented and the value of the car as purchased"). Thus, the Court rejects this argument by Intel.

As for Intel's argument about component parts, Plaintiffs respond that because Intel marketed directly to consumers to encourage them to purchase computers with Intel processors, the cases about components in construction are inapt. Even if Plaintiffs' are correct, Plaintiffs Robert Key and Joseph Anderson, the Oregon Named Plaintiffs, do not allege that a primary motivating factor for buying their computers was because they had an Intel chip.[16] Thus, what these Plaintiffs bought was a complete, integrated computer, which they did not purchase from Intel. Plaintiffs therefore fail sufficiently to allege a claim under Oregon's UTPA.

### 2. U.S. Virgin Islands

Intel argues that Plaintiffs' state subclass claims under the consumer protection statute of the U.S. Virgin Islands should be dismissed because no Named Plaintiff resides there. Plaintiffs respond that the U.S. Virgin Islands is part of the Plaintiffs' nationwide claims and that Plaintiffs

---

[16] The Court makes no determination about whether Plaintiffs could state a claim against Intel under Oregon's UTPA if Plaintiffs did make such an allegation.

can substitute in a named representative later. Plaintiffs cite *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 476-77 (S.D. Cal. 2012). *Tait*, however, involved class certification where an Illinois named representative was typical of part of the class but not the entire class and so the court, rather than deny certification to the entire class, granted certification conditioned upon the substitution of another named representative. *Id.* This case does not support the proposition that Plaintiffs may maintain a state subclass without a named representative from that state. Additionally, the fact that Plaintiffs' nationwide claims (alleged under California law) include the U.S. Virgin Islands does not mean that Plaintiffs can also bring a state-specific claim under the U.S. Virgin Islands' consumer protection law. It is irrelevant to that analysis.

The Ninth Circuit has held that "[e]ach class member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 594 (9th Cir. 2012). At this point, no alleged transaction took place in the U.S. Virgin Islands, and there is thus no allegation from which the U.S. Virgin Islands' consumer protection law can arise. As a result, Plaintiffs' may not bring U.S. Virgin Islands subclass claims. *See, e.g.*, *Pardini v. Unilever United States, Inc.*, 961 F. Supp. 2d 1048, 1061 (N.D. Cal. 2013) ("Thus, '[w]here . . . a representative plaintiff is lacking for a particular state, all claims based on that state's laws are subject to dismissal.'" (alterations in original) (quoting *Granfield v. NVIDIA Corp.*, 2012 WL 2847575, at *4 (N.D. Cal. July 11, 2012)).

### 3. Injunctive Relief

In a footnote, Intel states that "because certain statutory claims provide for injunctive relief only, and the named Plaintiffs for those jurisdictions have not alleged any future harm that must be avoided, those claims should be dismissed for the same reasons discussed above." Intel

cites its argument relating to standing and, as discussed above, the Court finds that Plaintiffs lack standing to request injunctive relief.

### 4. Unfair Practices

Intel argues that Plaintiffs fail to allege an "unfair" practice under the laws of the 25 states that allow for such claims. Intel asserts that the FTC Act test applies in 21 of these states. As discussed above, under that test "[a] practice is 'unfair' . . . only if it 'causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.'" *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) (quoting 15 U.S.C. § 45(n)). The Court has already found that if Plaintiffs can sufficiently allege standing, they will allege a substantial injury and that the benefits do not outweigh the alleged harm. The Court thus considers whether Plaintiffs could have reasonably avoided the injury.

"An injury is reasonably avoidable if consumers have reason to anticipate the impending harm and the means to avoid it, or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Id.* (quotation marks omitted). Plaintiffs did not have reason to anticipate the impending harm or the means to avoid it. The alleged defects are highly technical, and the average consumer would not comprehend them and would not be able to mitigate them. Even if a consumer knew to research side-channel attacks and became exposed to the alleged articles and patent applications, they likely would not understand them and unless they were a highly skilled computer programmer or hardware engineer, would not be able to do anything about what they had read.

After both alleged defects became widely known in 2018, average consumers still could not do anything to mitigate them other than download the provided patches. Any degradation in performance or other negative repercussions caused by those patches are beyond the control of

the average consumer. As more exploitations of the alleged defects are discovered, the average consumer continues to be powerless to avoid any potential harm. Thus, Plaintiffs could not reasonably have avoided their injuries. Plaintiffs will be able to state a claim for unfair practices under the 21 states that follow the FTC Act test if they can allege standing.

The remaining three states are Oklahoma, Nebraska, and Montana. Intel does not discuss each state individually but argues that these states use a multifactor test that considers consumer injury, whether the practice at issue violates some public policy, and whether it is "immoral, unethical, oppressive, or unscrupulous." The tests in these states, however, are not all the same.

An unfair trade practice Oklahoma is "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Okla. Stat. Ann. tit. 15, § 752. Because the Court has already found that Plaintiffs will be able to allege substantial injury, they will be able to allege an unfair practice under Oklahoma law if they can allege standing.

In Nebraska, the Supreme Court and Court of Appeals cited with approval in cases involving consumers the definition of unfair practices set forth in *Raad v. Wal-Mart Stores, Inc.*, 13 F. Supp. 2d 1003 (D. Neb. 1998), even though that case involved a dispute between merchants. The court in *Raad* defined a practice as unfair if it: "(1) fell within some common-law, statutory, or other established concept of unfairness or (2) was immoral, unethical, oppressive, or unscrupulous." *Id.* at 1014. The court noted that although other courts had found substantial injury to be sufficient in the context of consumers, in the context of merchants the court did not find substantial injury alone to be sufficient under a consumer protection statute. The Nebraska Supreme Court and Court of Appeals did not address substantial injury when approving the *Raad* definition in the context of consumers.

PAGE 63 – OPINION AND ORDER

Whether alleged conduct is immoral, unethical, oppressive, or unscrupulous is generally a question of fact. *See, e.g.*, *Chroniak v. Golden Inv. Corp.*, 983 F.2d 1140, 1146 (1st Cir. 1993) ("[W]hether a party has committed an unfair or deceptive act, within the meaning of [the consumer protection act], is a *question of fact*.") (emphasis in original) (quotation marks omitted); *Maeda v. Pinnacle Foods Inc.*, 390 F. Supp. 3d 1231, 1251 (D. Haw. 2019) ("Ordinarily, the question of whether a practice constitutes an unfair or deceptive trade practice is a question of fact.); *Laura Laaman & Assocs., LLC v. Davis*, 2017 WL 5711393, at *9 (D. Conn. Nov. 27, 2017) ("Whether a practice is unfair and thus violates CUTPA is an issue of fact."); *Full Spectrum Software, Inc. v. Forte Automation Sys., Inc.*, 100 F. Supp. 3d 50, 59 (D. Mass. 2015) ("Nonetheless, whether an act or practice is 'immoral, unethical, oppressive or unscrupulous' is the kind of fact-specific determination best left for a jury."). Plaintiffs allege that Intel knew about specific security vulnerabilities, knew how to fix them, chose not to fix them so that it could meet aggressive performance standards goals and grow market share and profit, concealed the problems and made misleading representations to consumers about the security of Intel's processors, and have issued security patches only as third parties disclose specific exploitations of the alleged vulnerabilities. At the motion to dismiss stage of the litigation, that is enough plausibly to allege an unfair practice, Plaintiffs can allege standing. Whether it will survive more inquiry at summary judgment or class certification is a question for another day.

In Montana, an unfair trade practice is "a practice contrary to 'established public policy *and* which is either immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Anderson v. ReconTrust Co., N.A.*, 407 P.3d 692, 700 (Mont. 2017) (emphasis in original) (quoting *Rohrer v. Knudson*, 203 P.3d 759, 764 (Mont. 2009)). Because the Court has

found that Plaintiffs will be able to allege a substantial injury if they can allege standing, the Court evaluates whether Plaintiffs have alleged that Intel's conduct went against established public policy. Plaintiffs allege in the Consolidated Complaint that Intel's conduct violates established public policy. That is a legal conclusion that the Court does not accept as true. Plaintiffs do not allege what public policy Intel's conduct is purportedly contradicting. Nor did Plaintiffs identify or argue this point in their response or at oral argument. Thus, Plaintiffs' unfair practices claim in Montana fails.

### 5.  Unconscionable Practices

Intel asserts that a smaller subset of states allow for an "unconscionable" practices claim and that although the definition of unconscionable varies, all states require at least some form of gross misconduct. Intel argues that Plaintiffs fail to allege gross misconduct and that their allegations relating to unconscionable conduct are bare legal conclusions. The Court, however, considers all allegations in the Consolidated Complaint, and not just the allegations stated in the specific claim, particularly because each claim begins with an allegation incorporating the previous allegations by reference.

Intel does not discuss any differences between the state's statutes and focuses solely on the fact that they all require some form of gross negligence. As a result, the Court will evaluate this claim using Utah's statute. Utah's statute is to be construed liberally to protect consumers. Utah Code Ann. § 13-11-2. Under its provisions, any "unconscionable act or practice by a supplier in connection with a consumer transaction violates th[e] act," *Id.* § 13-11-5, and "[i]f it is claimed or appears to the court that an act or practice may be unconscionable, the parties shall be given a reasonable opportunity to present evidence as to its setting, purpose, and effect to aid the court in making its determination[,]" Given that the statute is to be construed liberally to protect consumers and that if it appears a practice *may* be unconscionable a claim is to proceed,

PAGE 65 – OPINION AND ORDER

if Plaintiffs can allege standing, Plaintiffs will sufficiently allege an unconscionable practice at this stage of the case. *See also McMillan v. Collection Prof'ls Inc.*, 455 F.3d 754, 759-60 (7th Cir. 2006) (considering unconscionability in the context of the Fair Debt Collection Practices Act and explaining that whether a particular practice is unconscionable in the eyes of an unsophisticated consumer is often a question of fact and thus "district courts must act with great restraint when asked to rule in this context on a motion to dismiss" because in most instances "a proper application of the rule will require that the plaintiff be given an opportunity to demonstrate that his allegations are supported by a factual basis responsive to the statutory standard"). Additionally, for the same reasons whether a practice is unfair is generally a question of fact, whether practice is unconscionable is generally a question of fact.

Because Intel briefed no differences between the various states, the Court's denial is without prejudice for Intel to renew its motion if it believes other states have a different standard than Utah or would not consider unconscionability an issue of fact. Intel may raise such an argument against any amended consolidated complaint.

## G.  Summary of Rulings

The Court GRANTS Intel's motion to dismiss because Plaintiffs fail to allege sufficient facts to show their standing to request monetary, declaratory, or injunctive relief, or to show the standing of the Entity Defendants in Pennsylvania and Mississippi to bring their state subclass claims. As for Intel's motion against the sufficiency of Plaintiffs' allegations, to provide guidance to the parties for efficient motion practice against any amended consolidated complaint, the Court will summarize its substantive rulings.

Even if Plaintiffs can allege standing, as currently pleaded, Plaintiffs do not sufficiently allege: (1) Plaintiffs' nationwide breach of implied warranty claim; (2) Plaintiffs' nationwide FAL, CLRA, UCL fraudulent practices, and common law fraud claims; (3) Plaintiffs' nationwide

PAGE 66 – OPINION AND ORDER

constructive fraud claim; (4) Plaintiffs' nationwide UCL unlawful practices claim; (5) Plaintiffs' Wisconsin subclass Deceptive Trade Practices Act claim; (6) Plaintiffs' Kentucky subclass Consumer Protection Act claim; (7) Plaintiffs' Oklahoma subclass Consumer Protection Act claim; (8) Plaintiffs' Oregon subclass Unlawful Trade Practices Act claim; (9) Plaintiffs' U.S. Virgin Islands subclass claims; and (10) Plaintiffs' unfair practices state subclass claim under Montana's Unfair Trade Practices and Consumer Protection Act.

Further, if Plaintiffs can allege standing, as currently pleaded, Plaintiffs sufficiently allege: (1) Plaintiffs' nationwide UCL unfair practices claim; (2) Plaintiffs' nationwide unjust enrichment or quasi-contract claim; (3) Plaintiffs' state subclass deceptive practices claims for states modelled on the FTC Act; (4) Plaintiffs' state subclass deceptive practices claims for Mississippi, Ohio, and Pennsylvania; (5) Plaintiffs' state subclass deceptive practices claims for states requiring the duty to disclose; (6) Plaintiffs' state subclass deceptive practices claims for states requiring intent; (7) Plaintiffs' subclass deceptive practices claims for states requiring reliance; (8) Plaintiffs' state subclass unfair practices claims, except for states specifically dismissed above; and (9) Plaintiffs' state subclass unconscionable practices claims.

## CONCLUSION

The Court GRANTS Intel's Corrected Motion to Dismiss (ECF 141). The Court also gives Plaintiffs LEAVE TO AMEND within 28 days from the date of this Opinion and Order. Finally, the Court directs the Clerk of the Court to send a copy of this Opinion and Order to the Clerk of the Judicial Panel on Multidistrict Litigation.

**IT IS SO ORDERED**.

DATED this 27th day of March, 2020.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

PAGE 67 – OPINION AND ORDER